[S.F. No. 22887. In Bank. Oct. 27, 1972.]

RALPH COBBS, Plaintiff and Respondent, v.
DUDLEY F. P. GRANT, Defendant and Appellant.

## Counsel

McNamara, Lewis & Craddick, Marrs A. Craddick and Richard G. Logan for Defendant and Appellant.

Bonne, Jones & Bridges, Frederick O. Field, Home & Clifford, Kirtland & Packard, Overton, Lyman & Prince, Robert F. Lewis, James K. Barnum, Stammer, McKnight, Barnum, Bailey & Barnett, Leighton M. Bledsoe, Bledsoe, Smith, Cathcart, Johnson & Rogers, J. Thomas Crowe, Crowe, Mitchell & Crowe, Lewis Fenton, Hoge, Fenton, Jones & Appel, Howard

Hassard, Hassard, Bonnington, Rogers & Huber, Edwin Heafey, Sr., Crosby, Heafey, Roach & May, Robert L. Lamb, Lamb & Glynn, Raymond A. Leonard, Leonard & Lyde, W. Lee Pope, Wycoff, Parker, Boyle & Pope, Sherman C. Wilke, Wilke, Fleury, Sapunor & Hoffelt and Russell Bruno as Amici Curiae on behalf of Defendant and Appellant.

William Shannon Parrish and George Hauer for Plaintiff and Respondent.

Hillel Chodos, Robert E. Cartwright, Edward I. Pollock, Theodore A. Horn, Marvin E. Lewis, William H. Lally, Joseph W. Cotchett, Herbert Hafif and Leonard Sacks as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This medical malpractice case involves two issues: first, whether there was sufficient evidence of negligence in the performing of surgery to sustain a jury verdict for plaintiff; second, whether, under plaintiff's alternative theory, the instructions to the jury adequately set forth the nature of a medical doctor's duty to obtain the informed consent of a patient before undertaking treatment. We conclude there was insufficient evidence to support the jury's verdict under the theory that defendant was negligent during the operation. Since there was a general verdict and we are unable to ascertain upon which of the two concepts the jury relied, we must reverse the judgment and remand for a new trial. To assist the trial court upon remand we analyze the doctor's duty to obtain the patient's informed consent and suggest principles for guidance in drafting new instructions on this question.

Plaintiff was admitted to the hospital in August 1964 for treatment of a duodenal ulcer. He was given a series of tests to ascertain the severity of his condition and, though administered medication to ease his discomfort, he continued to complain of lower abdominal pain and nausea. His family physician, Dr. Jerome Sands, concluding that surgery was indicated, discussed prospective surgery with plaintiff and advised him in general terms of the risks of undergoing a general anesthetic. Dr. Sands called in defendant, Dr. Dudley F. P. Grant, a surgeon, who after examining plaintiff, agreed with Dr. Sands that plaintiff had an intractable peptic duodenal ulcer and that surgery was indicated. Although Dr. Grant explained the nature of the operation to plaintiff, he did not discuss any of the inherent risks of the surgery.

A two-hour operation was performed the next day, in the course of which the presence of a small ulcer was confirmed. Following the surgery the ulcer disappeared. Plaintiff's recovery appeared to be uneventful, and he was permitted to go home eight days later. However, the day after he returned home, plaintiff began to experience intense pain in his abdomen. He immediately called Dr. Sands who advised him to return to the hospital. Two hours after his readmission plaintiff went into shock and emergency surgery was performed. It was discovered plaintiff was bleeding internally as a result of a severed artery at the hilum of his spleen. Because of the seriousness of the hemorrhaging and since the spleen of an adult may be removed without adverse effects, defendant decided to remove the spleen. Injuries to the spleen that compel a subsequent operation are a risk inherent in the type of surgery performed on plaintiff and occur in approximately 5 percent of such operations.

After removal of his spleen, plaintiff recuperated for two weeks in the hospital. A month after discharge he was readmitted because of sharp pains in his stomach. X-rays disclosed plaintiff was developing a gastric ulcer. The evolution of a new ulcer is another risk inherent in surgery performed to relieve a duodenal ulcer. Dr. Sands initially decided to attempt to treat this nascent gastric ulcer with antacids and a strict diet. However, some four months later plaintiff was again hospitalized when the gastric ulcer continued to deteriorate and he experienced severe pain. When plaintiff began to vomit blood the defendant and Dr. Sands concluded that a third operation was indicated: a gastrectomy with removal of 50 percent of plaintiff's stomach to reduce its acid-producing capacity. Some time after the surgery, plaintiff was discharged, but subsequently had to be hospitalized yet again when he began to bleed internally due to the premature absorption of a suture, another inherent risk of surgery. After plaintiff was hospitalized, the bleeding began to abate and a week later he was finally discharged.

Plaintiff brought this malpractice suit against his surgeon, Dr. Grant. The action was consolidated for trial with a similar action against the hospital. The jury returned a general verdict against the hospital in the amount of $45,000. This judgment has been satisfied. The jury also returned a general verdict against defendant Grant in the amount of $23,800. He appeals.

The jury could have found for plaintiff either by determining that defendant negligently performed the operation, or on the theory that defendant's failure to disclose the inherent risks of the initial surgery vitiated plaintiff's consent to operate. Defendant attacks both possible grounds of

the verdict. He contends, first, there was insufficient evidence to sustain a verdict of negligence, and, second, the court committed prejudicial error in its instruction to the jury on the issue of informed consent.

I

Defendant's attack on the sufficiency of the evidence relates to the state of the medical testimony. Three experts testified at the trial: defendant, Dr. Sands, and defendant's expert, Dr. Yates. No expert witness was produced by plaintiff. The three experts were consistent in the opinion that the decision to operate as well as the actual procedure evidenced due care. Thus defendant insists that if experts unanimously opine that the defendant exercised due care, the jury may not substitute its judgment and find negligence. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Clemens* v. *Regents of University of California* (1970) 8 Cal.App.3d 1, 11 [87 Cal.Rptr. 108]; *Marvin* v. *Talbott* (1963) 216 Cal.App.2d 383, 385 [30 Cal.Rptr. 893, 5 A.L.R.2d 908].)

■ Plaintiff contends the jury could reach a conclusion contrary to that of the experts because the decision to operate on his duodenal ulcer comes under the recognized exception to the need for medical testimony: the facts present a medical question resolvable by common knowledge. (*Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519]; see cases collected in *Bardessono* v. *Michels* (1970) 3 Cal. 3d 780, 789, fn. 6 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) Where a shoulder is injured in an appendectomy (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258]), or a clamp is left in the abdomen (*Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509 [305 P.2d 36]), expert testimony is not required since the jury is capable of appreciating and evaluating the significance of such events. However, when a doctor relates the facts he has relied upon in support of his decision to operate, and where the facts are not commonly susceptible of comprehension by a lay juror, medical expert opinion is necessary to enable the trier of fact to determine if the circumstances indicated a need for surgery.

The record before us requires this case to be governed by the general rule. An X-ray examination of plaintiffs' stomach disclosed "There is extreme irritability of the duodenal bulb within which on two films is a faint collection of barium [swallowed by plaintiff for the purposes of this test] consistent with a very tiny active duodenal ulcer." Since it was a "very tiny" ulcer, and since conversely, the ulcer was "active" and had produced "extreme irritability," only an expert would be capable of understanding whether surgery was immediately necessary for plaintiff's well-being. Simi-

larly there was uncontradicted testimony that although plaintiff had ceased to experience pain rhythmically, continuous pain indicated the ulcer was penetrating the wall of the duodenum. If all five layers of the duodenum are penetrated a patient can bleed profusely and emergency surgery is essential to save his life. Again only an expert can appreciate the significance of the constant pain and whether surgery was indicated therefor. Finally there was evidence plaintiff's stools were dark and tarry. While the lay mind is unable to draw any conclusion from such evidence, to a doctor this is additional confirmation of a penetrating ulcer. Under such circumstances the common knowledge exception to the need for expert medical testimony is not applicable.

A fortiori, plaintiff's theory of negligence in the performance of the surgery is not sustainable under the common knowledge exception when, under these circumstances, there is uncontradicted expert testimony the operation had been performed with due care. Even with the exercise of due care the spleen may be injured during operations similar to that performed on plaintiff approximately 5 percent of the time, due to the need to mechanically retract the spleen to obtain access to the site of the operation. ■ "The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation." (*Siverson* v. *Weber* (1962) 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97].)

In any event, plaintiff contends, defendant made statements from which the jury could conclude defendant had admitted negligence. ■ Defendant is a medical expert; if he in fact made inculpatory declarations of negligence, such admissions could be deemed the expert testimony necessary to sustain the verdict. However, the evidence pointed out by plaintiff in support of this theory does not constitute an admission of negligence.

Plaintiff first emphasizes testimony by defendant that surgery is not necessary for most ulcers unless there are complications. Plaintiff argues that from such testimony, in light of plaintiff's medical history, the jury could conclude there was no indication of a need for surgery. This is merely a restatement of the common knowledge argument which we have rejected above. ■ Defendant's statement that surgery is not usually warranted is not an admission of a negligent decision to operate when all the medical experts testified that in plaintiff's case surgery was indicated.

Plaintiff also urges that although defendant testified he visually inspected the spleen before suturing, the jury could infer from the subsequent hem-

orrhaging that his inspection was not made with due care. The bleeding was attributable to a small tear at the hilum of the spleen. ■ Defendant and his expert witnesses gave uncontradicted testimony that injuries not apparent during an operation may subsequently become manifest. In light of this testimony and the additional uncontradicted testimony that the surgery was performed with due care, it would have been improper speculation for the jury to infer the injury should have been apparent to a careful surgeon. (*Dobson* v. *Industrial Acc. Com.* (1952) 114 Cal.App.2d 782, 786-787 [251 P.2d 349].)

■ Finally, plaintiff relies on his own testimony that defendant said to plaintiff, "He [i.e., defendant] blamed himself for me being back in there [the hospital for a second time]." Defendant denied having made such a remark. However, even if the jury had chosen to believe plaintiff, defendant's statement signifies compassion, or at most, a feeling of remorse, for plaintiff's ordeal. Since a medical doctor is not an insurer of result, such an equivocal admission does not constitute a concession that he lacked or failed to use the reasonable degree of learning and skill ordinarily possessed by other members of the profession in good standing in the community, or that he failed to exercise due care. (*Phillips* v. *Powell* (1930) 210 Cal. 39, 43 [290 P. 441]; *Markart* v. *Zeimer* (1924) 67 Cal.App. 363, 371 [227 P. 683]; *Donahoo* v. *Lovas* (1930) 105 Cal.App. 705, 710 [288 P. 698]; see *Lashley* v. *Koerber* (1945) 26 Cal.2d 83 [156 P.2d 441] (admission *together with other evidence,* sufficient to submit question of negligence to jury).)

■ We are convinced there is not substantial evidence to support a jury verdict on the issue of defendant's liability on the theory that he was negligent either when he decided to operate or in performing the surgery. Under article VI, section 13, of the California Constitution, we must examine the record to determine if the giving of instructions on this issue may have prejudiced the jury and caused a miscarriage of justice. The test we apply is whether it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Inasmuch as there was a general verdict, we cannot know whether the jury found defendant liable on the theory his decision to undertake, or the performance of, the operation was negligent, or whether it found him liable under the alternative theory: failure to obtain plaintiff's informed consent for surgery. It is clear from the record that both concepts were vigorously presented to the jury. Since it is impossible to determine on which theory the jury verdict rested, we conclude it is reasonably probable there has been a miscarriage of justice. We therefore reverse the judgment.

## II

Since the question of informed consent is likely to arise on retrial, we address ourselves to that issue. (Code Civ. Proc., § 43.) In giving its instruction the trial court relied upon *Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 803 [82 Cal.Rptr. 67], a case in which it was held that if the defendant failed to make a sufficient disclosure of the risks inherent in the operation, he was guilty of a "technical battery" (also see *Pedesky* v. *Bleiberg* (1967) 251 Cal.App.2d 119, 123 [59 Cal.Rptr. 294]; *Hundley* v. *St. Francis Hospital* (1958) 161 Cal.App.2d 800, 802 [327 P.2d 131]). While a battery instruction may have been warranted under the facts alleged in *Berkey,* in the case before us the instruction should have been framed in terms of negligence.

■ Where a doctor obtains consent of the patient to perform one type of treatment and subsequently performs a substantially different treatment for which consent was not obtained, there is a clear case of battery. (*Berkey* v. *Anderson* (1969) *supra,* 1 Cal.App.3d 790 (allegation of consent to permit doctor to perform a procedure no more complicated than the electromyograms plaintiff had previously undergone, when the actual procedure was a myelogram involving a spinal puncture); *Bang* v. *Charles T. Miller Hosp.* (1958) 251 Minn. 427 [88 N.W.2d 186] (plaintiff consented to a prostate resection when uninformed that this procedure involved tying off his sperm ducts); *Corn* v. *French* (1955) 71 Nev. 280 [289 P.2d 173] (patient consented to exploratory surgery; doctor performed a mastectomy); *Zoterell* v. *Repp* (1915) 187 Mich. 319 [153 N.W. 692] (consent given for a hernia operation during which doctor also removed both ovaries).)

However, when an undisclosed potential complication results, the occurrence of which was not an integral part of the treatment procedure but merely a known risk, the courts are divided on the issue of whether this should be deemed to be a battery or negligence. (*Gray* v. *Grunnagle* (1966) 423 Pa. 144 [223 A.2d 663] (failure to warn a patient a spinal operation involved an inherent risk of permanent paralysis; battery); *Belcher* v. *Carter* (1967) 13 Ohio App.2d 113 [42 Ohio Ops.2d 218, 234 N.E.2d 311] (failure to warn of danger of radiation burns; battery); *Nolan* v. *Kechijian* (1949) 75 R.I. 165 [64 A.2d 866] (operation to strengthen ligaments of spleen when spleen was removed; trespass to the body and negligence); *Natanson* v. *Kline* (1960) 186 Kan. 393 [350 P.2d 1093] (radiation treatment produced a severe burn; *semble* battery or negligence); *Natanson* v. *Kline* (1960) 187 Kan. 186 [354 P.2d 670] (rehearing of previous case; negligence); *Mitchell* v. *Robinson* (Mo. 1960) 334 S.W.2d 11 [79 A.L.R.2d 1017] (vertebrae broken during insulin shock treatment; negligence).) California authorities have favored a negligence theory. (*Carmichael* v.

*Reitz* (1971) 17 Cal.App.3d 958 [95 Cal.Rptr. 381] (pulmonary embolism caused by adverse reaction to drug; negligence); *Dunlap* v. *Marine* (1966) 242 Cal.App.2d 162 [51 Cal.Rptr. 158] (cardiac arrest allegedly caused by administration of anesthetic; negligence); *Tangora* v. *Matanky* (1964) 231 Cal.App.2d 468 [42 Cal.Rptr. 348] (anaphylactic shock as a result of intramuscular penicillin shot; negligence); *Salgo* v. *Leland Stanford etc. Bd. Trustees* (1957) 154 Cal.App.2d 560 [317 P.2d 170] (paralysis of lower extremities after aortographic examination; negligence).)

Dean Prosser surveyed the decisions in this area and concluded, "The earliest cases treated this as a matter of vitiating the consent, so that there was liability for battery. Beginning with a decision in Kansas in 1960 [*Natanson* v. *Kline* (1960) *supra,* 187 Kan. 186], it began to be recognized that this was really a matter of the standard of professional conduct . . . . [T]he prevailing view now is that the action . . . is in reality one for negligence in failing to conform to the proper standard . . . ." (Fns. omitted; Prosser on Torts (4th ed. 1971) pp. 165-166.)

Although this is a close question, either prong of which is supportable by authority, the trend appears to be towards categorizing failure to obtain informed consent as negligence. That this result now appears with growing frequency is of more than academic interest; it reflects an appreciation of the several significant consequences of favoring negligence over a battery theory. As will be discussed *infra,* most jurisdictions have permitted a doctor in an informed consent action to interpose a defense that the disclosure he omitted to make was not required within his medical community. However, expert opinion as to community standard is not required in a battery count, in which the patient must merely prove failure to give informed consent and a mere touching absent consent. Moreover a doctor could be held liable for punitive damages under a battery count, and if held liable for the intentional tort of battery he might not be covered by his malpractice insurance. (Comment, *Informed Consent in Medical Malpractice* (1967) 55 Cal.L.Rev. 1396.) Additionally, in some jurisdictions the patient has a longer statute of limitations if he sues in negligence.

We agree with the majority trend. ■ The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented. When the patient gives permission to perform one type of treatment and the doctor performs another, the requisite element of deliberate intent to deviate from the consent given is present. However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the con-

sent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence.

The facts of this case constitute a classic illustration of an action that sounds in negligence. Defendant performed the identical operation to which plaintiff had consented. The spleen injury, development of the gastric ulcer, gastrectomy and internal bleeding as a result of the premature absorption of a suture, were all links in a chain of low probability events inherent in the initial operation.

## III

Since this is an appropriate case for the application of a negligence theory, it remains for us to determine if the standard of care described in the jury instruction on this subject properly delineates defendant's duty to inform plaintiff of the inherent risks of the surgery. In pertinent part, the court gave the following instruction: "A physician's duty to disclose is not governed by the standard practice in the community; rather it is a duty imposed by law. A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment."

Defendant raises two objections to the foregoing instruction. First, he points out that the majority of the California cases have measured the duty to disclose not in terms of an absolute, but as a duty to reveal such information as would be disclosed by a doctor in good standing within the medical community. (*Carmichael* v. *Reitz* (1971) *supra,* 17 Cal.App.3d 958, 976; *Dunlap* v. *Marine* (1966) *supra,* 242 Cal.App.2d 162; *Tangora* v. *Matanky* (1964) *supra,* 231 Cal.App.2d 468; contra, *Berkey* v. *Anderson* (1969) *supra,* 1 Cal.App.3d 790.) One commentator has imperiously declared that "good medical practice is good law." (Hagman, *The Medical Patient's Right to Know* (1970) 17 U.C.L.A. L.Rev. 758, 764.) Moreover, with one state and one federal exception every jurisdiction that has considered this question has adopted the community standard as the applicable test.[1] Defendant's second contention is that this near unanimity reflects strong policy reasons for vesting in the medical community the unques-

---

[1] The one state jurisdiction adopting a requirement of full disclosure is New Mexico. (*Woods* v. *Brumlop* (1962) 71 N.M. 221 [377 P.2d 520].) The federal case is *Canterbury* v. *Spence* (D.C. Cir. 1972) 464 F.2d 772. Citations to the leading cases in jurisdictions that have adopted the community practice standard are collected in Comment, *Informed Consent in Medical Malpractice* (1967) *supra,* 55 California Law Review 1396, 1397, footnote 5.

tioned discretion to determine if the withholding of information by a doctor from his patient is justified at the time the patient weighs the risks of the treatment against the risks of refusing treatment.

The thesis that medical doctors are invested with discretion to withhold information from their patients has been frequently ventilated in both legal and medical literature. (See, e.g., *Salgo* v. *Leland Stanford etc. Bd. Trustees* (1957) *supra*, 154 Cal.App.2d 560, 578; *Mitchell* v. *Robinson* (Mo. 1960) *supra*, 334 S.W.2d 11 (even though patient was upset, agitated, depressed, crying, had marital problems and had been drinking, the court found that since no emergency existed and he was legally competent he should have been advised of the risks of shock therapy); Mosely, Textbook of Surgery (3d ed. 1959) pp. 93-95; Laufman, Surgical Judgment, in Christopher's Textbook of Surgery (Davis ed. 1968) pp. 1459, 1461; Louisell & Williams, Medical Malpractice (1970) § 22.02; McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment* (1957) 41 Minn.L.Rev. 381; Plante, *An Analysis of "Informed Consent"* (1968) 36 Fordham L.Rev. 639.) Despite what defendant characterizes as the prevailing rule, it has never been unequivocally adopted by an authoritative source. Therefore we probe anew into the rationale which purportedly justifies, in accordance with medical rather than legal standards, the withholding of information from a patient.

Preliminarily we employ several postulates. The first is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment. The third is that the patient's consent to treatment, to be effective, must be an informed consent. And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions.

From the foregoing axiomatic ingredients emerges a necessity, and a resultant requirement, for divulgence by the physician to his patient of all information relevant to a meaningful decisional process. In many instances, to the physician, whose training and experience enable a self-satisfying evaluation, the particular treatment which should be undertaken may seem evident, but it is the prerogative of the patient, not the physician, to determine for himself the direction in which he believes his interests lie.

To enable the patient to chart his course knowledgeably, reasonable familiarity with the therapeutic alternatives and their hazards becomes essential.

■ Therefore, we hold, as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each.

A concomitant issue is the yardstick to be applied in determining reasonableness of disclosure. This defendant and the majority of courts have related the duty to the custom of physicians practicing in the community. (*Aiken* v. *Clary* (Mo. 1965) 396 S.W.2d 668, 675; *Roberts* v. *Young* (1963) 369 Mich. 133 [119 N.W.2d 627, 630]; *Haggerty* v. *McCarthy* (1962) 344 Mass. 136 [181 N.E.2d 562, 565, 92 A.L.R.2d 998]; *DiFilippo* v. *Preston* (1961) 53 Del. 539 [173 A.2d 333, 339].) The majority rule is needlessly overbroad. Even if there can be said to be a medical community standard as to the disclosure requirement for any prescribed treatment, it appears so nebulous that doctors become, in effect, vested with virtual absolute discretion. (See Note, *Physicians and Surgeons* (1962) 75 Harv.L.Rev. 1445; Waltz and Scheuneman, *Informed Consent to Therapy* (1970) 64 Nw.U.L.Rev. 628.) The court in *Canterbury* v. *Spence, supra,* 464 F.2d 772, 784, bluntly observed: "Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves." Unlimited discretion in the physician is irreconcilable with the basic right of the patient to make the ultimate informed decision regarding the course of treatment to which he knowledgeably consents to be subjected.

A medical doctor, being the expert, appreciates the risks inherent in the procedure he is prescribing, the risks of a decision not to undergo the treatment, and the probability of a successful outcome of the treatment. But once this information has been disclosed, that aspect of the doctor's expert function has been performed. The weighing of these risks against the individual subjective fears and hopes of the patient is not an expert skill. Such evaluation and decision is a nonmedical judgment reserved to the patient alone. ■ A patient should be denied the opportunity to weigh the risks only where it is evident he cannot evaluate the data, as for example, where there is an emergency or the patient is a child or incompetent. For this reason the law provides that in an emergency consent is implied (*Wheeler* v. *Barker* (1949) 92 Cal.App.2d 776, 785 [208 P.2d 68]; *Preston* v. *Hubbell* (1948) 87 Cal.App.2d 53, 57-58 [196 P.2d

113]), and if the patient is a minor or incompetent, the authority to consent is transferred to the patient's legal guardian or closest available relative (*Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 883 [95 Cal.Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *Doyle* v. *Giuliucci* (1965) 62 Cal.2d 606 [43 Cal.Rptr. 697, 401 P.2d 1]; *Bonner* v. *Moran* (1941) 126 F.2d 121 [75 App.D.C. 156, 139 A.L.R. 1366]). In all cases other than the foregoing, the decision whether or not to undertake treatment is vested in the party most directly affected: the patient.

The scope of the disclosure required of physicians defies simple definition. Some courts have spoken of "full disclosure" (e.g., *Berkey* v. *Anderson, supra,* 1 Cal.App.3d 790, 804; *Salgo* v. *Leland Stanford etc. Bd. Trustees, supra,* 154 Cal.App.2d 560, 578) and others refer to "full and complete" disclosure (*Stafford* v. *Shultz* (1954) 42 Cal.2d 767, 777 [270 P.2d 1]; *Pashley* v. *Pacific Elec. Ry. Co.* (1944) 25 Cal.2d 226, 235 [153 P.2d 325]), but such facile expressions obscure common practicalities. Two qualifications to a requirement of "full disclosure" need little explication. First, the patient's interest in information does not extend to a lengthy polysyllabic discourse on all possible complications. A mini-course in medical science is not required; the patient is concerned with the risk of death or bodily harm, and problems of recuperation. Second, there is no physician's duty to discuss the relatively minor risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence.[2] When there is a common procedure a doctor must, of course, make such inquiries as are required to determine if for the particular patient the treatment under consideration is contraindicated—for example, to determine if the patient has had adverse reactions to medication; but no warning beyond such inquiries is required as to the remote possibility of death or serious bodily harm.

However, when there is a more complicated procedure, as the surgery in the case before us, the jury should be instructed that when a given procedure inherently involves a known risk of death or serious bodily harm, a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur. Beyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as

---

[2]For example, the risks inherent in the simple process of taking a common blood sample are said to include hematoma, dermatitis, cellulitis, abscess, osteomyelitis, septicemia, endocarditis, thrombophlebitis, pulmonary embolism and death, to mention a few. (Harrison, Principles of Internal Medicine (5th ed. 1966) pp. 726, 1492, 1510-1514.) One commentator states that California law does not require that the "patient be told too much." (Hagman, *The Medical Patient's Right to Know, supra,* 17 U.C.L.A. L.Rev. 758, 766.)

a skilled practitioner of good standing would provide under similar circumstances.

In sum, the patient's right of self-decision is the measure of the physician's duty to reveal. That right can be effectively exercised only if the patient possesses adequate information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision. (*Canterbury* v. *Spence, supra,* 464 F.2d 772, 786.)

We point out, for guidance on retrial, an additional problem which suggests itself. There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given. Here the record discloses no testimony that had plaintiff been informed of the risks of surgery he would not have consented to the operation. (*Shetter* v. *Rochelle* (1965) 2 Ariz. App. 358 [409 P.2d 74]; *Sharpe* v. *Pugh* (1967) 270 N.C. 598 [155 S.E.2d 108]; cf. *Aiken* v. *Clary* (Mo. 1965) *supra,* 396 S.W.2d 668.)

The patient-plaintiff may testify on this subject but the issue extends beyond his credibility. Since at the time of trial the uncommunicated hazard has materialized, it would be surprising if the patient-plaintiff did not claim that had he been informed of the dangers he would have declined treatment. Subjectively he may believe so, with the 20/20 vision of hindsight, but we doubt that justice will be served by placing the physician in jeopardy of the patient's bitterness and disillusionment. Thus an objective test is preferable: i.e., what would a prudent person in the patient's position have decided if adequately informed of all significant perils. (*Canterbury* v. *Spence, supra,* 464 F.2d 772, 791.)

The burden of going forward with evidence of nondisclosure rests on the plaintiff. Once such evidence has been produced, then the burden of going forward with evidence pertaining to justification for failure to disclose shifts to the physician.

Whenever appropriate, the court should instruct the jury on the defenses available to a doctor who has failed to make the disclosure required by law. Thus, a medical doctor need not make disclosure of risks when the patient requests that he not be so informed. (See discussion of waiver: Hagman, *The Medical Patient's Right to Know, supra,* 17 U.C.L.A. L.Rev. 758, 785.) Such a disclosure need not be made if the procedure is simple and the danger remote and commonly appreciated to be remote.

A disclosure need not be made beyond that required within the medical community when a doctor can prove by a preponderance of the evidence he relied upon facts which would demonstrate to a reasonable man the disclosure would have so seriously upset the patient that the patient would not have been able to dispassionately weigh the risks of refusing to undergo the recommended treatment. (E.g., see discussion of informing the dying patient: Hagman, *The Medical Patient's Right to Know, supra,* 17 U.C.L.A. L.Rev. 758, 778.) Any defense, of course, must be consistent with what has been termed the "fiducial qualities" of the physician-patient relationship. (*Emmett* v. *Eastern Dispensary and Casualty Hospital* (1967) 396 F.2d 931, 935 [130 App.D.C. 50].)

The judgment is reversed.

Sullivan, Acting C. J., McComb, J., Peters, J., Tobriner, J., and Burke, J., concurred.