Cherri WOLFE, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. 80–0207–B.

United States District Court,
S.D. California.

March 14, 1985.

David C. Siegel, Olins, Foerster & Siegel,
San Diego, Cal., Mark P. Friedlander, Jr.,
Arlington, Va., for plaintiff.

Karen M. Shichman, Asst. U.S. Atty.,
San Diego, Cal., for defendant.

MEMORANDUM DECISION

BREWSTER, District Judge.

This action arises under the Federal Tort
Claims Act, 28 U.S.C. § 2671, *et seq.* (here-
inafter FTCA) and 28 U.S.C. § 1346(b) in

conjunction with the National Swine Flu Immunization Act of 1976.[1] It was transferred to the United States District Court for the District of Columbia for coordinated pretrial proceedings, after which it was remanded to this Court for trial.

Early in 1976, medical doctors at the Fort Dix Army Hospital in New Jersey isolated the virus which causes a strain of flu known as the Swine Influenza. Concerned that this illness could cause a nationwide epidemic the following winter, the United States government enacted the above legislation on an emergency basis, and implemented one of the largest immunization programs this country has ever undertaken. The Swine Flu Act provided for free immunization of all persons in the country. Public health clinics throughout the country were utilized as distribution centers. Serum was distributed to hospitals, clinics and doctors' offices. Every clinic, hospital or physician who dispensed the vaccine without charge and who obtained the recipient's signature on the government consent form provided was considered a "program participant." [2] Although not applicable here, the Swine Flu Act assumed all legal liability for any injuries caused by such program participants to the same extent as such participant could be held liable under the law of the state where the inoculation occurred.[3] If any inoculation was administered by any entity other than a program participant, the United States still subjected itself to liability for injury in accordance with the provisions of the FTCA.[4] The Swine Flu Act imposed exclusively on the United States the duty to warn recipients of the risks and benefits of the vaccine.[5] The defendant sought to perform this obligation by furnishing its comprehensive consent form with the serum to be dispensed by the health care providers. During the summer and fall of 1976 the defendant conducted a mass media promotion of this free immunization program, which commenced inoculations in October of 1976.

Plaintiff received a bivalent Swine Flu inoculation on November 29, 1976, from a nurse at the office of Harvey M. Bloom, M.D. She was motivated to take the flu shot by the extensive national media advertising described above. However, plaintiff neither saw nor signed the government consent form at the time she received her shot, because the dispensing office for an unknown reason had not used the form. Accordingly, the dispensing doctor was not a "program participant" as defined in the Swine Flu Act, and the defendant's liability in the instant case must be analyzed under negligence principles applicable to the government under the FTCA.

The defendant's vaccine administration program did set up a distribution system by which an adequate supply of printed consent forms accompanied all vaccine batches distributed to all inoculation facilities from the distribution center, whether program participants or not. In this case the dispensing doctor's employee picked up the vaccine from the center, but the doctor did not recall ever seeing the form in his office. The defendant, in its extensive media promotion of the vaccine program did not advise the public of the possible risks of adverse reactions which might occur, although certain possible reactions were foreseen by the defendant. In fact, sporadic reports of infrequent but serious neurological reactions [6] led to a sudden halt in the immunization program on or about December 16, 1976, after approximately 42 million persons had been inoculated within only seven weeks.

The defendant's consent form fully and completely describes this egg-based vaccine, and adequately apprises the reader of

---

1. 42 U.S.C. § 247b(j)–(*l*) (Public Law 94–380; 90 Stat. 1113) (hereinafter Swine Flu Act)

2. 42 U.S.C. § 247b(k)(2)(B)

3. 42 U.S.C. § 247b(k)(2)(A)(i)

4. 42 U.S.C. § 247b(k)(1)(B), and § 247b(k)(2)(A)

5. 42 U.S.C. § 247b(j)(1)(F)

6. I.e., Landry-Guillain-Barre Syndrome and Transverse Myelitis

possible adverse reactions which might occur, from allergic reaction up to and including death. For purposes of this case, the form, if used, would have fulfilled the defendant's obligation to warn. Moreover, the form would have provided the plaintiff with an informed basis for deciding whether or not to have the inoculation. Plaintiff contended she would not have had the shot had she seen the form—not for concern over possible allergic reaction, but just on general principles.

Plaintiff became ill within approximately forty-five minutes after the inoculation. Although she felt fine for the twenty minutes she stayed in the doctor's office after receiving her shot, she became ill while driving home from the doctor's office. She experienced rapid heart beat, shortness of breath, dizziness, flushed face, shakiness, a feeling of nausea and a sense of fear that she might die. She did not observe any heat or rash at the site of injection, nor wheezing. She pulled into a food establishment and with help contacted a neighbor who came and took the plaintiff home. Within minutes thereafter her husband took her to a hospital emergency room where she presented the above symptoms approximately two hours after the shot. She believed she had suffered a reaction to the flu shot. The initial diagnosis was "acute reaction to flu shot," but no specific findings of allergic reaction or antiphilactic shock were made, and no medication to reverse an allergic reaction or antiphilactic shock was administered. She was given a tranquilizer and anti-nausea medication and sent home. The following day she returned with complaints of persistent rapid heart beat, shakiness and nausea. No objective findings of any system abnormalities were made. Plaintiff was reassured and again sent home. She again returned to Grossmont Hospital on December 3 with persistent complaints of rapid heart beat, shakiness and her adamant belief that she had suffered a reaction to the flu shot. At that time she was diagnosed as suffering an anxiety reaction, a psychological condition. No physical abnormalities were found.

The court notes that the plaintiff had been treated for anxiety reactions during the year immediately preceding her inoculation, although she did not list that fact on the brief questionnaire she filled out in the office where she was inoculated.

After December 3, 1983, batteries of diagnostic studies were performed on the plaintiff, and it appeared that she had a mild to moderate allergic sensitivity to a number of airborne irritants and some foods. Specifically, plaintiff tested as mildly to moderately sensitive to eggs, of which she was totally unaware, having eaten eggs all her life without known problems. Over the next two years she underwent a complete desensitization treatment for all of her allergies. Although her allergy condition was improved, her state of anxiety was not. Finally, after treatment for over four years by various psychologists and psychiatrists, she was treated by a psychiatrist with whom she apparently made progress toward complete recovery. During this entire period her personal problems were substantial, consisting primarily of marital and family difficulties which culminated in a divorce approximately three years after receiving her flu shot. She is now essentially recovered and leading a normal life. The entire course of plaintiff's medical treatment over five years cost approximately $80,727.47 and she lost approximately $13,800 in wages from her employment.

■■■ In actions brought under the Federal Tort Claims Act, the United States is liable only for negligent or wrongful acts or omissions of its employees while acting within the scope of their office or employment. 28 U.S.C. § 2671, *et seq.* The FTCA has been held to exclude liability under theories of strict or absolute liability. *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), *reh. denied,* 346 U.S. 841, 74 S.Ct. 13, 98 L.Ed. 362 (1953). In weighing the negligent or wrongful conduct, state law determines the standard of care required of a government agent. *Laird v. Nelms,* 406 U.S. 797, 92

S.Ct. 1899, 32 L.Ed.2d 499 (1972). In California, the duty of a health care provider to warn a patient of danger in order to give the patient a basis for an informed consent is well summarized in *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972) where the court required a physician to make "a reasonable disclosure of dangers inherently and potentially involved." *Id.* at 243, 104 Cal.Rptr. 505, 502 P.2d 1.

Plaintiff contends the defendant was negligent in the following respects: 1) Overemphasis of the danger of the illness and the effectiveness of the vaccine and failure to warn of risks from the inoculation in the national advertising of the program; 2) failure to adequately warn through the substantive content of the consent form which the defendant distributed; and 3) failure to set up a distribution system for the consent form which was more reasonably likely to reach each recipient of the shot, including the plaintiff.

Defendant contends the duty to warn was fulfilled by both the content of the consent form and the system for its distribution, and that the defendant was not negligent in warning its citizens of the possible danger of swine flu and the desirability of obtaining a flu shot. Defendant also maintains that plaintiff's anxiety reaction was not proximately caused by the flu shot in any event, but was merely temporarily related by coincidence.

■ The dispensing physician, not being a "program participant," is not the agent of the defendant. Even if that doctor be considered negligent in failing to use the consent form or in failing to warn the plaintiff of any risks, he was not sued and his liability is not before this court. Defendant's evidence of the use of a distribution system which joined the consent forms with the vials of vaccine distributed by the distribution centers to the dispensing offices was unrefuted. It appeared reasonably conceived and executed to assure reasonable likelihood of use of the forms in the dispensing process.

■ Applying the applicable legal standards to the facts of this case, this court holds that the defendant was not negligent in the design or the distribution of its consent form. Furthermore, the defendant was not negligent in viewing the possibility of a swine flu epidemic with alarm and strenuously urging its citizens to immunize themselves against it. The fact that the epidemic never materialized does not persuade this court that the concern was unfounded. With 42 million persons inoculated—⅕ of the entire United States population—who can say that the extent of inoculations was not a significant factor in the relatively light impact of swine flu during the winter of 1976–77? Certainly plaintiff did not suffer one of the dangerous reactions which were foreseen, or which would be reasonably foreseeable by an entity in like circumstances administering inoculations en masse. There is no duty to warn of every possible risk, no matter how remote or bizarre.[7]

■ In any event, the court also finds that the inoculation on November 26, 1976, did not proximately contribute to or cause the plaintiff's extended psychological problem of an anxiety reaction. There was no evidence of allergic reaction within thirty minutes of the inoculation as would have been expected. The plaintiff was enduring a stressful period in her life due primarily to marital and family problems and secondarily to financial problems. These difficulties framed her psychological vulnerability to anxiety reactions and panic attacks, both of which she had suffered during the year immediately preceding her flu inoculation. Both of those problems were acute at the time of the inoculation, and the court finds from the preponderance of the evidence that such psychological problems, rather than an allergic reaction to the egg-based vaccine, were the proximate contributing cause of her acute anxiety reaction.

■ Finally, even if the flu shot had in fact precipitated an anxiety attack, such an unusual and bizarre reaction could not have

7. *Cobbs v. Grant,* supra, at 243, 104 Cal.Rptr. 505, 502 P.2d 1

been so foreseeable that the defendant should be held to a duty to warn of it in addition to those warnings in the consent form. Even assuming some relationship between the inoculation and the anxiety reaction, the evidence would not support a finding that the inoculation caused any more than two weeks of adverse effects. It is far more likely that the relatively severe contemporaneous sources of anxiety in the plaintiff's life were the cause of her psychological problems.

For the reasons stated, judgment will be entered for the defendant with costs.