Filed 12/17/21  Richmond v. Patel CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| MIKE RICHMOND et al.,<br><br>  Plaintiffs and Appellants,<br><br>    v.<br><br>RAVI PATEL et al.,<br><br>  Defendants and Respondents. | B310903<br>(Los Angeles County<br>Super. Ct. No.<br>BC643147) |

APPEAL from a judgement of the Superior Court of Los Angeles County, Margaret L. Oldendorf, Judge.  Affirmed.

Law Offices of Ralph B. Wegis, Ralph B. Wegis and Edward Gordon for Plaintiffs and Appellants Mike Richmond and Kellie Richmond.

McElroy Parris Trial Lawyers and Ashley Parris for Plaintiff and Appellant Kellie Richmond.

Cole Pedroza, Kenneth R. Pedroza, Cassidy C. Davenport; Lebeau-Thelen, Dennis R. Thelen and Kevin Thelen for Defendants and Respondents.

_____

A pathologist misdiagnosed appellant Mike Richmond's pancreatic tumor.  Relying on the pathology report, respondent oncologist Ravi Patel recommended chemotherapy for Richmond with a drug regimen that is accepted in the medical community. Richmond consented to donate blood and tissue for research.  Two years later, a second biopsy revealed that Richmond has a rare type of cancer that should have been surgically removed, not treated with chemotherapy.  He sued his medical providers.

After a bench trial, the court gave judgment to respondents Dr. Patel and Comprehensive Blood & Cancer Center (CBCC).  It found (1) Dr. Patel was not negligent for relying on the pathology report or recommending chemotherapy, (2) no evidence that Richmond was surreptitiously placed in a clinical trial to financially benefit respondents, nor did Dr. Patel misrepresent the diagnosis to place Richmond in a clinical trial, and (3) no medical battery occurred because Richmond consented to a biopsy and weighed the recommendations of Dr. Patel and other oncologists before agreeing to chemotherapy.  The record supports the judgment.  We affirm.

## FACTS AND PROCEDURAL HISTORY[1]
### *Richmond's 2013 Diagnosis of Adenocarcinoma*

After a CT scan revealed an abnormal mass on Richmond's pancreas and lesions on his liver, he was referred to Dr. Patel, an

_____

[1] The record contains 12 volumes of reporter's transcript, plus appendices, from a three-week trial.  Appellants' statement

2

oncologist with 30 years of experience in his field. At his first meeting with Richmond on March 6, 2013, Dr. Patel ordered a biopsy. With Richmond's consent, a radiologist performed a CT-guided biopsy and prepared tissue samples on March 8, 2013.

The tissue samples were analyzed by Dr. Miranda, a board-certified pathologist. In her March 12, 2013 pathology report, Dr. Miranda's "final diagnosis" was that Richmond's tissue was "consistent with infiltrating poorly differentiated adenocarcinoma." She did not express doubt about her diagnosis to Dr. Patel. No immunohistochemistry (IHC) test was done because the tissue sample was inadequate. A defense expert testified that IHC tests are used if "there's not evidence that it's adenocarcinoma."

Adenocarcinoma is the most common form of pancreatic cancer, comprising about 97 percent of cases. It is treated with chemotherapy. A patient like Richmond, who presented with stage IV metastatic adenocarcinoma, could expect to live 12 to 15 months *with* chemotherapy, or 6 to 12 months *without* chemotherapy. The treatment exacts a toll on the body and impacts quality of life.

By contrast, a patient diagnosed with a neuroendocrine tumor of the pancreas is usually treated with surgery. Patients with neuroendocrine cancer may survive for five to 10 years. Dr. Patel did not order a special ocreotide scan that tags

---

of facts is barely three pages. We remind counsel that "[i]n every appeal, 'the appellant has the duty to fairly summarize all of the facts in the light most favorable to the judgment,' " a burden that grows with the complexity of the record. (*Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 739.)

3

neuroendocrine cancers because Richmond was not diagnosed with that type of cancer.

### *Richmond Consents To Chemotherapy*

When the parties discussed the biopsy results, Richmond asked if surgery was an option.  Dr. Patel said no, because the pathology report showed stage IV adenocarcinoma that was also in his liver.  Dr. Patel said the only way to extend Richmond's life expectancy was with chemotherapy.

Dr. Patel recommended chemotherapy with two drugs, Gemzar and Abraxane, because "this regimen was superior to previous regimens" and "was the treatment choice of this particular disease."  Abraxane is FDA approved for breast cancer.  The FDA-approved drug for adenocarcinoma is Folfirinox.

Dr. Patel did not tell Richmond that Abraxane was not FDA approved for pancreatic cancer.  He never intended to mislead or deceive Richmond.  Richmond's expert, Dr. Stark, testified that the lack of approval should have been disclosed but agreed that "use of Abraxane for metastatic pancreatic cancer was commonplace by early 2013 in American oncology."  Dr. Patel testified that a Gemzar/Abraxane regimen "was not an experimental treatment at all."  Richmond did not tell Dr. Patel he wanted "proven treatments."

Before deciding on a course of treatment, Richmond obtained a second opinion from Dr. Rosen, an oncologist at UCLA, who said Gemzar has been used for years for breast cancer patients but was also used for pancreatic cancer and was more effective when used with Abraxane.  Dr. Rosen did not tell Richmond that Abraxane was not specifically approved for pancreatic cancer.  He described a chemotherapy drug called 5FU as "extremely toxic" and "harsh on your body."  Richmond felt

4

comfortable with Dr. Rosen and believed what he was saying. Dr. Rosen did not recommend additional testing of Richmond's tissue.

Richmond obtained a third opinion from UCLA oncologist Dr. Wainberg. Though 5FU could be more toxic, Dr. Wainberg advocated its use for Richmond.

After weighing the opinions of the three oncologists, Richmond consented to chemotherapy with Gemzar and Abraxane; he reasoned that it "was pretty much the standard. It's what they're using right now." He began treatment on April 1, 2013. He had a bad reaction, experiencing swelling in his extremities, weight gain, fatigue, nausea, and pain. He suffered emotionally as well. Scans showed that his tumor was stable or getting better.

### *Richmond Consents to Submit Specimens for Research*

Richmond signed a "Consent to Participate in Collection of Biological Sample(s) for Diagnostic Research" on March 6, 2013. It reads: "You are being asked to participate in a research study. The purpose of the study is to obtain periodic blood samples and previously obtained biological specimens (i.e., tumor tissue) which researchers will use to help them develop new ways of diagnosing and treating your disease." The form continues, "If you agree to participate in this study, a blood sample will be taken periodically at a time when you are having blood drawn. A sample of any previously obtained biological specimen (i.e., tumor tissue) may also be collected. . . . There should be minimal risk or discomfort in this study. These risks would involve the normal discomfort and complications involved in performing a blood draw. The alternative is to decline to participate in the study. **Your participation is strict1y voluntary.**"

A CBCC executive testified that the consent was "ongoing" and was intended to allow collection of samples "on and after" March 6, 2013, the date it was signed. He noted that "logic" demanded a reading that the consent was ongoing, even if the form referred to "previously obtained" specimens. Richmond testified that under the consent, his role was to be "a sample donor."

Richmond's tissue samples were sent to CBCC's biorepository. A doctor examined the samples, found they lacked useful material, and destroyed them. The tissue was not sent out for research.

### *Richmond Does Not Participate In a Clinical Trial*

Dr. Patel operated CBCC in Bakersfield.[2] CBCC diagnoses and treats cancer patients, providing chemotherapy, radiation treatment, and imaging. An affiliate of CBCC is CBCC Global Research (Global), another of Dr. Patel's businesses. Global conducts clinical trials for new cancer treatments, including pancreatic cancer. The goal of clinical trials is to "make these additional therapies available for the potential benefit of the patient." Patients eligible for trials are found by prescreening CBCC's electronic medical records.

Patients must consent to participation in a clinical trial. The treating physician tells the patient about the trial. If the patient is interested, information is provided about the nature and purpose of the experiment, the discomforts and risks, and appropriate alternatives to participation. Dr. Patel thought Richmond might be a candidate for a UCLA clinical trial for metastatic adenocarcinoma. Richmond's expert, Dr. Stark, said it

---

[2] Bakersfield Memorial Hospital purchased CBCC and gradually took over the business from January to July 2013.

is routine to ask new patients if they are interested in clinical trials.

Richmond was "adamantly against" joining a clinical trial because "I didn't want to be a guinea pig." Dr. Patel was aware of Richmond's feelings and never discussed a trial with him again. Richmond never signed consent forms to be in a trial, so no data about him could be transmitted to a reporting agency.

Dr. Patel testified that Richmond was "never" part of a clinical trial, which requires sponsorship and "rigorous" documentation. Global's clinical trial coordinator testified that Richmond was not enrolled in a clinical trial and no data about him was collected. Patients are never secretly enrolled in clinical trials. CBCC's clinical operations manager testified that Richmond's medical chart did not show participation in a trial; moreover, the drug regimen he was on "was not part of a clinical trial." She was "confident that he was not on a clinical trial."

Richmond underwent regular scans and blood tests to monitor his cancer. His medical file was reviewed before his appointments, to see if he was healthy enough to have a chemotherapy infusion or if he qualified for any new trials.

### Richmond's Misdiagnosis Is Discovered In 2015

By 2015, Richmond could no longer tolerate the bodily effects of chemotherapy and decided to stop treatment. He had already surpassed the normal life expectancy for a patient with metastatic adenocarcinoma. Dr. Patel recommended that he go to UCLA, where a liver biopsy was taken. It showed his tissue had "features consistent with an adenocarcinoma" but had "more significant" features of a neuroendocrine tumor. Tumors were surgically removed from his liver and pancreas. A postsurgical

biopsy definitively showed that his cancer is neuroendocrine. Richmond was told that he had been misdiagnosed.

### *Testimony On the Standard of Medical Care*

Defense experts testified that Dr. Patel met the medical standard of care by relying on Dr. Miranda's pathology report and recommending a regimen of Gemzar and Abraxane.  The trial court found the testimony of the defense experts "particularly credible and persuasive."

The pathology expert, Dr. Burg, stated that Dr. Miranda made a "final diagnosis" of adenocarcinoma.  A clinician could initiate treatment based on the pathology report.  If additional tissue had existed (it did not), it could have been stained to determine whether the tumor originated outside of the pancreas.

Dr. Van Scoy-Mosher, a medical oncologist, testified that Dr. Patel "had good grounds" to conclude Richmond had adenocarcinoma based on the pathology report, and to treat him for that diagnosis with "the only reasonable treatment option," chemotherapy.  Gemzar and Abraxane was "the best option in this situation" and "was accepted by the oncology community by that time."  Dr. Rosen concurred in this treatment plan.  Dr. Stark testified that on September 3, 2013, the FDA approved Abraxane, individually or with Gemzar, for treatment of stage IV pancreatic cancer.

### *The Richmonds File Their Lawsuit*

In 2016, Richmond and his wife filed suit against respondents, Global, UCLA, Dr. Rosen, Dr. Miranda, and others.  Dr. Miranda settled before trial.  Appellants dismissed their claims against all defendants except respondents before trial.  They allege causes of action for negligence, concealment, fraud, medical battery, and loss of consortium.

### *The Trial Court's Judgment*

A three-week bench trial was held in fall of 2020. The court issued a statement of decision on December 30, 2020. It entered judgment for respondents.

The court found no negligence. Dr. Patel reasonably ordered a biopsy of the pancreas and relied on the pathology report to recommend a course of treatment. The report had a final, unequivocal diagnosis of adenocarcinoma; Richmond did not show that Dr. Miranda wanted to conduct more tests to determine if the tissue specimen was a neuroendocrine tumor. Expert testimony showed that a chemotherapy regimen of Gemzar and Abraxane was an accepted medical treatment in 2013, not " 'unproven' " or " 'experimental.' "

The court found no concealment or fraud. Dr. Patel did not intend to deceive Richmond about his diagnosis or treatment and reasonably relied on the pathology report. Any claim of fraud "was highly speculative." Richmond did not prove with any credible evidence that he was placed in a clinical trial; his medical records do not reflect that he was surreptitiously placed in a trial. He consented to the use of his blood and " 'previously obtained' " tissue samples for " 'research.' " Taking tissue samples from him for diagnostic purposes, two days after he signed the consent, does not show fraud or concealment.

The court found no evidence of medical battery. Richmond consented to a biopsy; consented to use of his tissue for research; and consented to a Gemzar/Abraxane chemotherapy regimen on the recommendations of Dr. Patel and Dr. Rosen. Mrs. Richmond cannot claim loss of consortium because her husband has no claim against respondents.

# DISCUSSION

## 1. There Was No Medical Battery

Richmond argues that his consent to use "previously obtained" tissue for research did not allow use of biopsied specimens obtained two days *after* he signed the consent. He claims respondents exceeded the scope of his consent and committed medical battery by using his tissue for research. He writes, "the use of a later obtained biopsy for research is a battery" and "the use of biological samples by persons other than those specified is a battery."

Richmond's argument is flawed for several reasons. First, no battery is committed by examining cancerous cells that the patient agreed to have removed. Second, there is no substantial evidence that Richmond's cancer cells were used for research. Third, his interpretation of the consent contradicts his own testimony, wherein he identifies himself as "a sample donor." The existence of informed consent presents an issue of fact. (*Quintanilla v. Dunkelman* (2005) 133 Cal.App.4th 95, 115.) Richmond must "show on appeal that there is *no* substantial evidence to support [the] defense verdict, and not merely that substantial evidence would have supported a verdict in [his] favor." (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 297.)

A medical battery occurs if a doctor exceeds the scope of consent when treating a patient. The elements of the claim are (1) a patient gave conditional consent to treatment; (2) the doctor intentionally violated the condition while providing treatment; and (3) the patient suffered harm as a result of the doctor's violation of the condition. (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1497–1498.) "Where a doctor obtains consent of the patient to perform one type of treatment and subsequently

10

performs a substantially different treatment for which consent was not obtained, there is a clear case of battery." (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 239; *Dennis v. Southard* (2009) 174 Cal.App.4th 540, 544.)

Medical battery involves harm *to the patient*. Battery beyond the scope of consent occurs if a doctor promises to "remove some corns" from the patient's feet then removes portions of bones and maims her. (*Brown v. Bleiberg* (1982) 32 Cal.3d 426, 430–431, fn. 1.) Battery occurs if a patient consents to have a small mass removed from his scrotum for testing and does not consent to a major surgery involving his penis while under anesthesia. (*Burchell v. Faculty Physicians & Surgeons etc.* (2020) 54 Cal.App.5th 515, 519–521, 524.)[3]

The rationale for the consent doctrine is "to protect the patient's freedom to 'exercise . . . control over [one's] own body' by directing the course of *medical treatment*." (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1188.) This allows the patient " 'to accept or reject a recommended medical procedure.' " (*Id.* at p. 1186; *Flores v. Liu, supra,* 60 Cal.App.5th at pp. 292–293.) In a supplemental brief, Richmond points to the radiologist's notes as proof that multiple tissue cores were taken; however, he omits to mention that "[a]ll the tissue" was sent "for histopathology." The biopsy was done by "Truxtun Radiology Medical Group," not

---

[3] Other examples of battery are cited in *Cobbs v. Grant, supra,* 8 Cal.3d at page 239, e.g., when a patient consented to a prostate resection but was not told that his sperm ducts would be tied off; when a patient consented to exploratory surgery but the doctor performed a mastectomy; when a patient consented to a hernia operation but the doctor removed her ovaries.

respondents, so Richmond cannot claim that respondents committed a battery on him during the biopsy procedure.

Richmond is not claiming deprivation of his right to accept or reject a biopsy. Instead, he claims violation of a right to exercise control over excised tissue long after the biopsy is performed. The law does not "impose a tort duty on scientists to investigate the consensual pedigree of each human cell sample used in research." (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 135.) It is undisputed that Richmond had a suspicious pancreatic mass; he agreed to a biopsy to determine if it was malignant. Once the tissue was removed, Richmond had no further possessory interest in it. California law "drastically limits any continuing interest of a patient in excised cells." (*Id.* at p. 137.) No "battery" could be committed on cancer cells removed from Richmond by consent. He admits there is no authority for such a novel expansion of medical battery law.

Even if battery could be committed on excised cancer cells, Richmond's claim assumes that his tissue was used for research. The evidence shows Richmond's tissue was sent to Dr. Miranda for diagnostic purposes. There is no proof that the tissue was ever used again. Indeed, the evidence shows that CBCC deemed the sample inadequate and destroyed it. Assuming the tissue was examined in the interest of scientific advancement, this caused no harm to Richmond. Thus, the third element of a battery claim, harm, was unproven.

Finally, even if battery could be committed on excised cells and assuming the cells were used for research, Richmond's interpretation of the consent form is illogical. He signed the form on March 6, 2013, two days *before* tissue samples were taken in a biopsy. He knew any research was prospective when he

consented to participate in "the future development of improved diagnostic tests and treatments." He testified that under the consent, he agreed to be "a sample donor." The words "previously obtained" did not vitiate his consent to conduct research on his tissue sample taken March 8, 2013.

### 2. Dr. Patel Did Not Deceive Richmond

Richmond asserts that Dr. Patel intentionally failed to disclose that the Gemzar/Abraxane chemotherapy regimen was not FDA approved for pancreatic cancer. Richmond testified, "I wanted to go with whatever the current standard was for treating my particular cancer" and asked for "approved treatments." From his meetings with Dr. Patel and Dr. Rosen, Richmond understood that Abraxane and Gemzar was an approved treatment for his diagnosis. Richmond now claims that this was fraudulent inducement.

The trial court "carefully weighed all evidence" relating to Richmond's claims and found that he "failed to establish by a preponderance of the evidence any knowledge of falsity, or intent to deceive, on the part of Dr. Patel with regard to his diagnosis or plaintiff's treatment." It found Richmond's evidence "highly speculative and circumstantial." Richmond agreed to Gemzar and Abraxane after consulting Patel and Rosen, and "this chemotherapy regimen was not 'unproven' or 'experimental' at the time that Mr. Richmond commenced chemotherapy."

Viewing the record in the light most favorable to the judgment, we conclude that substantial evidence supports the trial court's findings.

Richmond began chemotherapy in April 2013; the FDA approved the Abraxane/Gemzar combination for pancreatic cancer on September 3, 2013. Even Dr. Stark, who testified for

13

Richmond, agreed that by early 2013, Abraxane was commonly used for metastatic pancreatic cancer. Dr. Patel denied that Richmond insisted on FDA-approved treatments. But in any event, Abraxane was already FDA approved for breast cancer: "Once FDA-approved, prescription drugs can be prescribed by doctors for both FDA-approved and unapproved uses" and "courts and the FDA have recognized the propriety and potential public value of unapproved or off-label drug use." (*United States v. Caronia* (2d Cir. 2012) 703 F.3d 149, 153; *Association of American Physicians & Surgeons v. United States Food and Drug Administration* (6th Cir. 2021) 13 F.4th 531, 534 [federal law "does not prohibit doctors from prescribing an FDA-approved drug (say, a chemotherapy drug approved to treat leukemia) for an 'off-label' use (say, treatment of other cancers)"].)

Richmond did not rely solely on Dr. Patel's therapeutic recommendation. He consulted UCLA oncologists for second and third opinions. One advocated for the experimental drug 5FU, which Richmond was told was "harsh" and "toxic." No one advocated for the use of Folfirinox, an FDA-approved drug.

The trial court found the defense experts particularly credible; we do not reweigh credibility determinations on appeal. They testified that the chemotherapy Richmond received was considered the best treatment. Richmond had what he wished, which was "the current standard was for treating my particular cancer" that was "approved" within the medical community as the best available oncological treatment.

Richmond cites hundreds of pages of routine medical notes documenting his treatment. For example, he cites the treatment center's "Infusion Administration Notes" showing he received infusions. He does not point to any statement in his medical

records showing he was treated with investigational drugs. His claim of being the subject of investigational treatment is pure speculation. All the experts, even Dr. Stark, agreed that the Abraxane/Gemzar regimen was widely used, accepted by the medical community, and approved by the FDA for treatment of metastatic pancreatic cancer in 2013. Multiple witnesses testified that Richmond was "never" in a clinical trial, and that his drug regimen was not the subject of a trial.

**DISPOSITION**

The judgment is affirmed. Appellants to bear all costs on appeal.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.