428 So.2d 1049 (1983)
Kerry E. HARWELL
v.
Dr. M.L. PITTMAN, Jr., et al.
No. 82 CA 0397.
Court of Appeal of Louisiana, First Circuit.
February 22, 1983.
Rehearing Denied April 6, 1983.
*1050 Leonard A. Washofsky, New Orleans, for plaintiff, appellant.
William S. Penick, New Orleans, for defendant, appellee.
Before LOTTINGER, COLE and CARTER, JJ.
CARTER, Judge.
This is an action for medical malpractice. Plaintiff, Kerry E. Harwell, sued Dr. M.L. Pittman, Jr.[1] alleging various acts of medical malpractice resulting from a gallbladder operation and complications which developed thereafter. From a judgment of the trial court in favor of defendant, dismissing plaintiff's suit, plaintiff has appealed.
Plaintiff first met Dr. Pittman at the emergency room of the St. Tammany Parish Hospital on May 4, 1978 when he was seeking a Testosterone injection in connection with treatment for prostatitis.
Plaintiff next saw Dr. Pittman on October 10,1978. There is conflicting testimony regarding what exactly transpired during this visit. Dr. Pittman testified that his records stated that plaintiff was complaining of severe epigastric pain and distress in the right upper quadrant of his abdomen which radiated into his back. According to Dr. Pittman's records, plaintiff was quite concerned about the effect this pain was having on his sex life and his inability to sleep. Dr. Pittman prescribed Librax for upper abdominal pain and distress and Dianabol to help with the sexual problems, and instructed plaintiff to return in 10 days. Plaintiff testified that the only purpose of the October 10, 1978 visit was for another Testosterone injection. Dr. Pittman's records do not reflect that an injection was given. Plaintiff denies any complaints being made about abdominal pain. Although plaintiff denies that Dr. Pittman prescribed any drugs for abdominal pain on October 10, 1978, the record reflects that prescriptions for Librax and Dianabol were *1051 filled by or on behalf of plaintiff at the K & B Drugstore in Bogalusa, Louisiana.
Dr. Pittman did not see plaintiff again until January 11, 1980. At this visit, plaintiff complained of pain in the right upper quadrant of his abdomen which radiated into his back. This pain was described as occurring more often after eating greasy foods and driving for long periods of time. Although plaintiff testified that his pain was only slight to moderate and in no way affected his sexual abilities, Dr. Pittman's testimony and/or hospital reports indicate plaintiff's complaints were of severe pain that even disturbed his sleep and sex life. There is also conflicting testimony regarding whether or not plaintiff took antacid medications such as "Rolaids" in attempts to relieve his pain.
On January 13, 1980, Dr. Pittman admitted plaintiff into the St. Tammany Parish Hospital for a complete diagnostic workup. The first gallbladder x-ray or cholecystogram did not visualize. Two days later a second cholecystogram was run, and the resulting impression was a normal cholecystogram. The results of the gallbladder echogram were also normal.
Other tests performed during this January 13-18, 1980 hospital stay were a complete blood count, urinalysis, biochemistry profile, electrocardiogram, glucose tolerance-three hour test, T-3 and T-4 (thyroid test), barium enema and G.I. series. These tests performed on plaintiff did not suggest any other possible cause of plaintiff's pain. Dr. Pittman's physical examination of plaintiff revealed marked tenderness of the right upper quadrant of his abdomen upon palpitation.
On the basis of the complete clinical picture, including all test results, plaintiff's complaint of pain, and physical examination findings, Dr. Pittman's clinical judgment was that plaintiff had a probable gallbladder problem. Dr. Pittman testified that after discussing the various test results with plaintiff, he recommended surgery to which plaintiff consented. Both plaintiff and his wife, who was present during the hospital stay, testified that Dr. Pittman never discussed the test results with plaintiff, nor the proposed surgical procedure. It was plaintiff's testimony that Dr. Pittman, on the last day of tests, after asking to be shown where the pain was coming from, stated "That's gallbladder country; let's go ahead and get it out." Dr. Pittman admits that risks of infection, hernia and anesthetic death were not discussed with plaintiff prior to obtaining consent to surgery.
Plaintiff was hospitalized on January 22, 1980 and surgery removing plaintiff's gallbladder and appendix was performed by Dr. Pittman on January 23, 1980. A broad spectrum antibiotic, Ampicillin, was prescribed to plaintiff to ward off any potential infection, plus numerous other medications for pain, nausea, etc.
On January 27, 1980, plaintiff's dressing was changed and the rubber drain running from the abdominal cavity to a separate incision was removed with no evidence of infection. Because plaintiff had developed a temperature, and although the wound did evidence infection, Dr. Pittman changed plaintiff from Ampicillin to Garamycin and Trimox, also antibiotics. This change was due to the fact that Dr. Pittman felt an infection was possible because of plaintiff's elevated temperature. A larger dosage of Trimox could be given without causing any nausea.
On January 28, 1980, the wound was inspected, partially opened and drained. A culture taken from the surgical wound site showed the presence of Escherichia Coli Bacteria (E. Coli Bacteria), a common infection. Dr. Pittman considered it a wound infection and superficial skin infection, since there was no purulent drainage from the separate incisional drain which had been removed the day before.
On February 3, 1980, plaintiff was discharged from the hospital on the basis of the absence of fever for the preceding four days and the fact that plaintiff's wound appeared to be doing well with granulation tissue present at the base of the abscess indicating healing process. Plaintiff was instructed on cleaning his wound and told *1052 to return to Dr. Pittman in 6 to 7 days. Dr. Pittman explained that plaintiff was purposely discharged with the wound open so that the healing would occur from the inside out and he felt that any further treatment could be accomplished through office visits.
Dr. Pittman saw plaintiff on two subsequent office visits, February 7 and 13,1980, at which times the incisional wound appeared to be healing normally.
On April 22, 1980, plaintiff's wound erupted with infection and he was taken to the emergency room at Chalmette General Hospital where the infection was drained with findings of silk sutures therein. From a culture taken, it was determined the infection was caused by E. Coli Bacteria. The hospital referred plaintiff to Dr. Hamilton Bruni who cleaned and examined plaintiff's wound on April 25, 1980. This examination also revealed an incisional hernia.
Dr. Bruni referred plaintiff to Dr. Suhail Naseri, a specialist in surgery. On June 29, 1980, plaintiff was admitted to Chalmette General Hospital and on July 1, 1980, Dr. Naseri repaired an incisional hernia that had developed at the surgical wound site.
On July 11,1980, plaintiff developed complications and he had to return to Chalmette General Hospital. On this occasion Dr. Naseri drained the abscess and ran a culture which again showed E. Coli Bacteria.
On or about August 23, 1980, plaintiff again developed complications. The wound site was again drained by Dr. Naseri. On October 30, 1980, Dr. Naseri examined plaintiff and found that the incision had healed and there was no sign of hernia. However, a second hernia developed sometime between October and December, 1980 and Dr. Naseri referred plaintiff to Dr. Carter Nance, a specialist in surgery.
On December 14, 1980, Dr. Nance admitted plaintiff into Hotel Dieu and surgical repair of the second hernia was performed on December 17, 1980. On the date of admittance, plaintiff was still complaining of abdominal pain. Plaintiff was subsequently discharged on December 21, 1980 in good condition. On December 23, 1980, plaintiff returned to Dr. Naseri's office again with infection at the surgical wound site and drainage was again necessary.
On January 4, 1981, plaintiff returned to Chalmette General Hospital complaining of severe abdominal pain. Plaintiff's wound was again drained and he was placed on two antibiotics.
On May 30, 1981, Dr. Naseri again drained the surgical wound site. A third incisional hernia developed and Dr. Naseri referred plaintiff to Dr. Ronald Lee Nichols, an expert on surgical infections. At the time of trial, plaintiff was under the care of Dr. Nichols who planned additional surgery to repair the hernia in the area of the surgical wound and to explore plaintiff's abdomen in an effort to locate the source of plaintiff's continuing infection.
The recurring post-operative complications have caused plaintiff to develop significant emotional problems. Dr. Millard Jensen, plaintiff's attending psychiatrist, testified that plaintiff has a fragile emotional make-up, which is approaching the point of disintegration because of the problems encountered since surgery. Dr. Jensen testified that a successful hernia repair and abolition of infection would definitely have a positive impact upon his psychiatric state. However, should the operation be unsuccessful, plaintiff would require more intensive psychiatric treatment to become psychiatrically improved. Dr. Jensen places much emphasis upon the surgical outcome as it relates to plaintiff's emotional condition.
The trial court found that plaintiff failed to prove that defendant did not exercise that degree of skill and care which is usually possessed and exercised by members of his profession and that the failure of the defendant to advise plaintiff of all material risks and available alternatives and the hazards attendant thereto did not vitiate plaintiff's consent to the surgery as such disclosure would not reasonably be expected to have caused plaintiff to decline the surgery.
*1053 Plaintiff contends that the trial court erred as follows: (1) In failing to find negligence on the part of Dr. Pittman in diagnosing a gallbladder condition and recommending surgery; (2) In failing to find that Dr. Pittman breached his duty of obtaining an "informed consent" and that had it not been for this breach, plaintiff would have withheld his consent to the surgery; and (3) In failing to award plaintiff general and special damages.
The plaintiff alleges that Dr. Pittman was negligent in diagnosing a gallbladder condition and recommending immediate surgery for its removal under the facts and circumstances present.
According to the jurisprudence of this state, the standard of care owed by a physician is to exercise that degree of skill and care which is usually possessed and exercised by members of his profession and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case before him. As a physician, he is not required to exercise the highest degree of skill and care possible, but to use reasonable care and diligence along with his best judgment. Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (La.1966); Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (La. 1953); Borne v. Brumfield, 363 So.2d 79 (La.App. 4th Cir.1978); Lauro v. Travelers Insurance Company, 261 So.2d 261 (La.App. 4th Cir.1972), writ refused, 262 La. 188, 262 So.2d 787 (1972).
Whether or not to operate is a matter of clinical judgment for the treating surgeon after weighing all the facts before him. Although Dr. Naseri testified that, in this case, he would have treated the plaintiff symptomatically and then repeated the tests after a few months, both Dr. Naseri and Dr. Axelrod readily admitted that conservative medical management treats only the symptoms of gallbladder disease and in no way reverses the disease process or keeps it from being progressive. Medication and diet adjustment are used to relieve the patient's symptoms. The only medical cure for gallbladder disease is surgical removal, and such surgical removal is the generally recommended treatment for patients with gallbladder disease. Thus, we cannot say that Dr. Pittman was negligent in his clinical decision of diagnosing gallbladder disease and recommending curative surgery over conservative medical management.
The plaintiff next alleges the trial court erred in failing to hold that Dr. Pittman's failure to disclose the material risks and available alternatives to the proposed, and later performed, surgery rendered plaintiff's consent thereto invalid. Plaintiff alleges that he would have withheld his consent to the surgery had he been properly informed.
The consent of a patient, expressed or implied, is required prior to a surgical operation, and a surgeon who operates without such consent is liable in damages, except in case of an emergency requiring immediate surgery for preservation of life or health, under circumstances in which it is impractical to obtain the consent of the patient or someone authorized to assume such responsibility. Babin v. St. Paul Fire and Marine Ins. Co., 385 So.2d 849 (La.App. 1st Cir.1980), writ denied, 386 So.2d 358 (La.1980); Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir.1978), writ denied, 362 So.2d 802 (La.1978).
The consent which is required must be obtained after the physician has disclosed all factors known to him concerning the proposed surgery, making the patient's consent informed. The duty of obtaining an "informed consent" prior to surgery is set forth in LSA-R.S. 40:1299.40 which provides as follows:
"A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated *1054 with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts."
The court in Percle v. St. Paul Fire & Marine Ins. Co., 349 So.2d 1289 (La.App. 1st Cir.1977), writ denied, 350 So.2d 1218 (La. 1977), summarized the duty as follows at page 1299:
"The doctrine is based on the principle that a physician owes the patient the duty to disclose adequately the proposed diagnostic, therapeutic or surgical procedure contemplated; the material risks involved; and the alternatives available, if any, in order that a patient of ordinary understanding, confronted with such disclosures and faced with a choice of undergoing the proposed treatment, or selecting an alternative process, or preferring refusal of all medical relief may, in reaching his decision, intelligently exercise his judgment by balancing the probable risks against probable benefits."
Plaintiff alleges that Dr. Pittman failed to advise him that the risks of infection and/or incisional herniation were greater in his case due to his obesity, and had Dr. Pittman advised him of such he would have withheld his consent to the proposed surgery. Plaintiff also contends Dr. Pittman failed to advise him of alternative treatments, namely conservative medical management, which information would also have been material in his decision to consent to surgery.
Dr. Pittman admitted that because of plaintiff's obesity the risks of infection and incisional herniation were greater and therefore made plaintiff a poorer candidate for surgery, but neither these risks, nor the risk of anesthetic death, were discussed with plaintiff prior to obtaining his consent to surgery. Dr. Pittman testified that his failure to inform was based upon his belief that plaintiff, as a grown man who had undergone surgery in the past, was aware of these risks that were common to any surgery. Dr. Pittman also testified that alternative treatments were not discussed with plaintiff, because in his opinion plaintiff's condition justified surgery.
For a causal connection to exist between the physician's failure to adequately divulge and damage to the patient, it must be shown that a disclosure of the significant risks incidental to the proposed treatment and the possible alternatives would have resulted in a decision against the proposed treatment. Thus the causation issue has been stated in objective terms: what would a prudent person in the patient's position have decided if he had been adequately informed? Percle v. St. Paul Fire & Marine Ins. Co., supra.
Although Dr. Pittman felt that the possibility of post-operative complications were greater in plaintiff's case because of his obesity, neither this fact nor the availability of conservative medical management as an alternative to surgery were discussed with plaintiff prior to obtaining his consent. The evidence is clear that plaintiff was not suffering from an acute cholecystitis at the time of the January, 1980 surgery, which would have required immediate surgical removal of the gallbladder.
We conclude that Dr. Pittman performed non-emergency surgery for a non-critical ailment on a relatively high risk patient without adequately informing the patient of the material risks of post-operative infection and incisional herniation, which were greater risks in this patient due to his obesity, and without informing the patient of the alternative treatment of medical management, and that a prudent person in the patient's position would not have undergone the operation at that time had he been so informed.
*1055 Plaintiff's third specification of error concerns the measure of damages proximately caused by Dr. Pittman's failure to obtain plaintiff's informed consent for the surgery and/or negligent determination to operate upon plaintiff.
As the trial court did not reach the issue of damages, we must therefore make a determination of damages as they are reflected in the record.
As a result of the gallbladder operation performed on January 23, 1980, plaintiff has continued to suffer from infection and herniation. Plaintiff has undergone two surgical repairs of the hernias, and a third was planned by Dr. Nichols at the time of trial. Because of the infection, plaintiff has had the surgical wound drained on at least four occasions since his gallbladder surgery.
Plaintiff's post-operative complications have also affected him psychologically. Dr. Jensen, plaintiff's psychologist, testified that plaintiff has displayed erratic behavior, anxiety, depression and involuntary exaggeration of physical symptoms which result from his physical problems. Dr. Jensen also stated that if future hernia repair proves to be unsuccessful, plaintiff's psychiatric prognosis is poor and could require psychiatric hospitalization.
These physical and psychological problems from which plaintiff suffers have also made an impact upon his domestic life. Plaintiff's emotional state because of his physical condition has caused strained relations between him and his wife and children. As earlier stated, plaintiff's physical condition has negatively affected any sexual relations.
In order to meet his continuing medical expenses and living expenses, plaintiff was forced to sell his air conditioning and heating installation and servicing business, two trucks, one automobile and a residence. Because of his physical and psychological condition, plaintiff contends that he is now unable to work, and if future surgery does not eliminate the infection and resulting herniation, he will be unable to work in the future.
The record reveals that plaintiff has incurred special damages in the sum of $10,733.95 as a result of past medical expenses. Recovery of this amount will be allowed.
We find that an award of $100,000.00 will compensate plaintiff for his past, present and future physical, mental and emotional pain and suffering, and disfigurement.
Plaintiff has presented evidence of a planned third hernia repair and the possibility of future psychiatric treatment should this surgical procedure prove to be unsuccessful. We feel that an award of $5,000.00 is adequate to cover future medical expenses. Nothing is awarded to plaintiff for future psychological expenses since this claim for damages is too speculative.
In order to meet his continuing medical and living expenses, plaintiff was forced to liquidate his entire air conditioning and heating business, plus sell certain other properties. Since the time of the surgery, and unless and until a future operation proves successful, plaintiff is totally disabled from performing any type of gainful employment. With his uncertain medical future and his lack of formal education, it is probable that plaintiff will have difficulty adjusting to another employment endeavor should he not be able to return to the air conditioning and heating business, or a related field.
Plaintiff was 31 years old at the time of the gallbladder surgery with a work life expectancy of 30.4 years. The income tax records introduced into evidence show plaintiff grossed an estimated $10,500.00 for the year preceding the surgery. There is no doubt that he is totally disabled at the present time. Since it is clear that plaintiff has been totally disabled since January of 1980 and will likely continue to be disabled for some extended time in the future even if the planned surgery is successful, we feel that an award of $150,000.00 will dosubstantial justice and adequately compensate plaintiff for the loss of past and future earnings.
*1056 For the foregoing reasons, the judgment of the trial court is reversed and set aside and judgment is rendered herein in favor of plaintiff, Kerry E. Harwell, against defendant, Dr. M.L. Pittman, Jr., in the full sum of $265,733.95 with legal interest thereon from date of judicial demand until paid. All costs of these proceedings are to be paid by defendant, Dr. M.L. Pittman, Jr.
REVERSED AND RENDERED.
NOTES
[1] Plaintiff's petition also named as defendant XYZ Insurance Company as Dr. Pittman's liability insurer. Answers to interrogatories identified St. Paul Fire and Marine Insurance Company as the liability insurer, but St. Paul was not made a party defendant in this proceeding.