963 P.2d 1184

Eugene SHABINAW and Vesna Shabinaw, Plaintiffs–Respondents,

v.

Charles A. BROWN, M.D., Defendant–Appellant.

No. 24106.

Supreme Court of Idaho.

Moscow, April 1998 Term.

Sept. 2, 1998.

Quane, Smith, Howard & Hull, Boise, for appellant. Bruce R. McAllister argued.

Legal Aid Clinic, University of Idaho College of Law, Moscow, for respondents. Jennifer Del Grosso and Nancy Luebbert argued.

SCHROEDER, Justice.

This is a second appeal from an action brought by Eugene and Vesna Shabinaw against Charles Brown, M.D. (Dr. Brown) alleging medical malpractice and lack of informed consent. After judgment was entered in favor of Dr. Brown upon a jury verdict of no liability, the district court granted a partial new trial on the issue of informed consent. Dr. Brown appealed the order granting a new trial. This Court vacated the order on the grounds that the district court's decision was based upon case law which was subsequently overruled. This Court remanded the case to the district court to reconsider its decision in light of the new case law. The district judge who initially ordered a new trial retired prior to ruling on remand. The newly assigned district judge again entered an order granting a new trial. Dr. Brown appeals the order.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

The background and prior proceedings of this case were previously summarized by this Court as follows:

Due to an inflammatory bowel disease known as ulcerative colitis, Eugene Shabinaw ("Mr.Shabinaw") had a total colectomy performed at the University of Michigan in 1968. Mr. Shabinaw apparently recovered quickly from the operation. Except for an ileostomy, an external appliance inserted as part of the operation, his life was unaffected.

The night of December 16, 1983, Mr. Shabinaw began experiencing severe abdominal cramps and noticed that his ileostomy was not functioning properly. Early the following morning, the Shabinaws went to the hospital where Mr. Shabinaw's regular physician, Dr. Adams, examined him. Dr. Adams concluded that Mr. Shabinaw was suffering from an acute small bowel obstruction. Dr. Adams then called Dr. Charles Brown ("Dr.Brown"), a local surgeon, because he believed Mr. Shabinaw's condition required immediate surgery.

There is conflicting testimony regarding whether Dr. Brown described the risks of this surgery to Mr. Shabinaw. Dr. Brown did not remember whether he discussed the risks with Mr. Shabinaw, but testified that he had a habit and routine of making such disclosures. Mr. Shabinaw, who had been medicated with the pain killing drug Demerol, did not recall speaking with Dr. Brown before surgery. Mrs. Shabinaw was in the room with Mr. Shabinaw before surgery and stated that, although Dr. Brown spoke briefly with Mr. Shabinaw before the surgery, they did not discuss the possible risks of surgery.

There is no dispute that Dr. Brown did not discuss any alternatives to surgery with Mr. Shabinaw before this operation. Dr. Brown testified that this was because no alternative treatment was reasonable under the circumstances, although he agreed on cross-examination that, with the power of retrospection, "a viable, favorable, acceptable, appropriate, beneficial form of treatment with Gene Shabinaw would have been placing a nasogastric tube as an alternative to surgery." Dr. Brown further testified that a nasogastric tube would relieve this type of bowel obstruction in thirty to fifty percent of all cases.

Several severe complications developed following this surgery. Because of these complications, Dr. Brown again operated on Mr. Shabinaw. Dr. Brown testified that he anticipated several potential complications arising from the second operation. The complications Dr. Brown expected, although somewhat more severe, were essentially the same as those Mr. Shabinaw experienced after the first operation. The complications Mr. Shabinaw experienced after both the first and second operations included sepsis, fistulae, and various postoperative infections. Mr. Shabinaw also experienced renal failure and adult respiratory distress syndrome after the second operation.

According to Dr. Brown, Mr. Shabinaw knew what complications to reasonably expect from the second operation. This knowledge was the result of both having experienced complications after the first surgery and a series of conversations between Mr. Shabinaw and Dr. Brown between the first and second operations. He also testified that he informed Mr. Shabinaw of the alternatives to the second surgery. Mr. Shabinaw claimed that Dr. Brown did not explain either alternatives to surgery or the potential complications of surgery. Mr. Shabinaw also testified that he would have avoided surgery had he known alternatives were available. Following the second operation, Mr. Shabinaw developed serious complications and was transferred to Sacred Heart Hospital in Spokane, Washington.

The Shabinaws filed suit against Dr. Brown in district court, alleging medical malpractice in the performance of both operations. After both parties presented their evidence and rested, the Shabinaws moved to amend their complaint under I.R.C.P. 15(b) to comport with the facts proven at trial. Specifically, they asked leave to allege Dr. Brown violated his duty to obtain informed consent from Mr. Shabinaw before both the December and February operations. The trial court granted the motion.

The jury returned a special verdict finding that Dr. Brown neither failed to meet the relevant standard of care nor failed to

obtain Mr. Shabinaw's informed consent before treating him. The Shabinaws timely moved for a partial judgment notwithstanding the verdict ("judgment n.o.v.") or, in the alternative, a partial new trial on the informed consent issue. The court issued a memorandum decision and order denying the Shabinaws' motion for a judgment n.o.v. and granting the Shabinaws' motion for partial new trial.

The district court found that Dr. Brown's retrospection could not influence the feasibility of nasogastric therapy as an alternative to the first surgery, stating that "[i]t either was or was not *initially* a viable alternative regardless of the bad result obtained on the first surgery." (District court's emphasis). The court inferred from Dr. Brown's testimony that nasogastric therapy was a viable alternative to the first surgery. This inference, combined with the uncontroverted evidence that alternative treatment was not discussed, convinced the district court that the clear weight of the evidence was insufficient to justify the jury's verdict.

The court also found that Dr. Brown did not clearly disclose the complications that he anticipated before the second surgery to Mr. Shabinaw. The court based this finding on its determination that Dr. Brown's testimony did not seem forthright or credible, and that complications Mr. Shabinaw developed after his previous surgery could not serve as notice of complications likely to occur after the second surgery.

*Shabinaw v. Brown,* 125 Idaho 705, 706–07, 874 P.2d 516, 517–18 (1994) (*Shabinaw I*).

Dr. Brown appealed the district court's decision, contending that the district court had abused its discretion by granting the Shabinaws' motion for partial new trial on the issue of informed consent. Two weeks after the district court ruled on the Shabinaws' motion, this Court issued *Sherwood v. Carter,* 119 Idaho 246, 805 P.2d 452 (1991), overruling that portion of *Rook v. Trout,* 113 Idaho 652, 747 P.2d 61 (1987), which held that section 39–4304 of the Idaho Code (I.C.) provided for a subjective patient-based standard of disclosure for informed consent. 119

Idaho at 256, 805 P.2d at 462. *Sherwood* held that I.C. § 39–4304 mandated "an objective, medical community standard for determining whether a patient has been adequately informed prior to giving consent for medical treatment." *Id.* Under this standard, "[t]he requisite pertinent facts to be disclosed to the patient are those which would be given by a like physician of good standing practicing in the same community." *Id.* Because the district court in the instant case had relied on *Rook* and other cases which called for application of a subjective patient-based standard for informed consent, this Court vacated the district court's order and remanded the case "to allow the trial court to reconsider its decision in light of the new law [*Sherwood* ]." *Shabinaw I,* 125 Idaho at 708, 874 P.2d at 519.

Judge Bengtson, who presided over the trial and granted the original motion for a new trial, retired before deciding the case on remand. A hearing was held on July 9, 1997, on the original motion for new trial with Judge Stegner, Judge Bengtson's successor, presiding. Judge Stegner concluded that there was no reason to disturb Judge Bengtson's previous order and, therefore, granted the Shabinaws' motion for new trial, stating that "the standard set out by *Sherwood* did not severely undermine or impair Judge Bengtson's prior ruling. There is nothing this court can glean from Judge Bengtson's earlier decision which suggests that the result would be different given the objective medical community standard set forth in *Sherwood.*" Judge Stegner also concluded that "fundamental fairness" required that the Shabinaws be granted a new trial so that they could have the opportunity to present their evidence under the *Sherwood* standard.

## II.

### STANDARD OF REVIEW

■ Generally this Court will "review a trial court's decision to grant or deny a new trial for an abuse of discretion, and ... will not disturb that decision absent a *manifest* abuse of this discretion." *Lanham v. Idaho Power Co.,* 130 Idaho 486, 497–98, 943 P.2d 912, 923–24 (1997). However, where a mo-

tion for a new trial is heard and passed upon by a judge who did not preside at the trial of the case, and an appeal is taken from the order granting a new trial, the appellate court must "examine and weigh the evidence the same as the *nisi prius* court should do." *Van Camp v. Emery,* 13 Idaho 202, 207, 89 P. 752, 754 (1907).

■ Judge Stegner did not preside at the trial of this case. He was required to pass on the Shabinaws' motion for new trial on the basis of the same record now before this Court. Under these limited circumstances, this Court has determined that its role on appeal is to freely review the evidence and weigh the evidence in the same manner as the trial court would do when ruling on a motion for new trial. *See Nafus v. Campbell,* 96 Idaho 366, 368, 529 P.2d 266, 268 (1974) (where trial judge who heard the matter resigned, the abuse of discretion standard did not apply; instead, the Supreme Court should make the determination whether a new trial should be granted or not).

"When a motion for new trial is based upon Rule 59(a)(6), the trial court must weigh the evidence presented at trial and grant the motion only where 'the verdict is not in accord with [its] assessment of the clear weight of the evidence.'" *Lanham,* 130 Idaho at 498, 943 P.2d at 924. "The trial judge is not required to construe the evidence in favor of the jury verdict." *Id.* To grant a new trial, the court must apply a two-prong test: "(1) the court must find that the verdict is against the clear weight of the evidence and that the ends of justice would be served by vacating the verdict; and (2) the court must conclude that a retrial would produce a different result." *Id.* (citations omitted).

This Court will review the evidence to determine whether it was proper to grant a new trial. The Court will defer to the findings of fact made by Judge Bengtson, if supported by the evidence, but will make an independent determination whether the record indicates the verdict was against the clear weight of the evidence and the ends of justice would be served by vacating the verdict, as well as whether a new trial would produce a different result.

## III.

## INDEPENDENT REVIEW OF THE RECORD

This Court must weigh all the evidence as to each essential element of an informed consent claim to determine whether the clear weight of the evidence is contrary to the verdict. *See Quick v. Crane,* 111 Idaho 759, 766, 727 P.2d 1187, 1194 (1986). "To establish a claim based on the doctrine of informed consent, a patient must prove three basic elements: nondisclosure, causation and injury." *Sherwood,* 119 Idaho at 257, 805 P.2d at 463.

■ Section 39–4305 of the Idaho Code provides that a

written consent, in the absence of convincing proof that it was secured maliciously or by fraud, is presumed to be valid for the furnishing of such care, treatment or procedures, and the advice and disclosures of the attending physician or dentist, as well as the level of informed awareness of the giver of such consent, shall be presumed sufficient.

The "convincing proof" requirement applies only to challenges regarding whether the patient consented to the furnishing of medical care. *Rook,* 113 Idaho at 658, 747 P.2d at 67. Where the patient is challenging the "advice and disclosures" and the "level of informed awareness," he is only required to overcome an ordinary presumption as to the sufficiency of consent. *Id.* Mr. Shabinaw challenges the advice and disclosures of Dr. Brown and is only required to overcome an ordinary presumption as to the sufficiency of consent.

To prove nondisclosure Mr. Shabinaw must prove that Dr. Brown failed to meet the objective, medical community-based standard of disclosure for informed consent as set forth in *Sherwood:*

A valid consent must be preceded by the physician disclosing those pertinent facts to the patient so that he or she is sufficiently aware of the need for, the nature of, and the significant risks ordinarily involved in the treatment to be provided in

order that the giving or withholding of consent be a reasonably informed decision. *The requisite pertinent facts to be disclosed to the patient are those which would be given by a like physician of good standing practicing in the same community.* *Sherwood,* 119 Idaho at 256, 805 P.2d at 462 (emphasis added). To prove causation Mr. Shabinaw must show by a preponderance of the evidence that "a reasonable person would have chosen no treatment or a different course of treatment had he or she been adequately informed by the physician." *Id.* at 259, 805 P.2d at 465. Mr. Shabinaw must also prove that he has been injured as a result of submitting to the medical procedure. *Id.* at 257, 805 P.2d at 463.

### A. Nondisclosure Element

At issue in this case is whether Dr. Brown made an adequate disclosure to Mr. Shabinaw of those pertinent facts which a like physician practicing in Moscow would have disclosed under the same or similar circumstances. Dr. Brown performed two surgeries on Mr. Shabinaw, one on December 17, 1983, and the other on February 6, 1984.

### 1. First surgery

In their original motion for new trial the Shabinaws argued that the record demonstrated that Dr. Brown failed to obtain Mr. Shabinaw's informed consent to performing the first surgery in that Dr. Brown admittedly failed to disclose to Mr. Shabinaw the existence of non-surgical alternatives to that surgery. Dr. Brown admitted that he did not discuss with Mr. Shabinaw any non-surgical alternatives to the first surgery. The issue is whether there were any viable non-surgical alternatives which Dr. Brown had a duty to discuss with Mr. Shabinaw.

There was conflicting testimony at trial as to whether inserting a nasogastric (NG) tube or IV into Mr. Shabinaw was a reasonable alternative to surgery which should have been discussed with him prior to performing the first surgery.

Dr. William Marineau was the only expert witness called by the Shabinaws who testified as to what the standard of care was with respect to obtaining an informed consent from a patient:

Q: Dr. Marineau, what, if anything, did the standard of care in Moscow, Idaho, in the time frame 1983, 1984, require with respect to advising a patient before surgery of possible alternative treatments or options?

A: The standard of care in Moscow at that time required informed consent to be given by the surgeon and agreed to by the patient. This involves the outline course of treatment, possible other types of treatments, alternatives to the other types of treatments, and rather explicit discussion of all the possible complications that could ensue from the different types of treatment modalities as they were undertaken.

Q: And, Doctor, do you have an opinion based on reasonable medical certainty, with respect to whether or not a failure to advise a patient of alternative treatment or the complications that might arise from a particular surgery or treatment, whether such a failure would meet or violate the standard of care in Moscow during that period?

A: Yes, I have an opinion.

Q: What is that opinion, sir?

A: It would violate the standard of care if that wasn't done.

Dr. Marineau did not specifically identify what particular alternatives to surgery or what complications arising from surgery should have been disclosed, but when asked by Mr. Shabinaw's attorney whether he thought Dr. Brown's performance of the first surgery fell below the standard of care in the community, Dr. Marineau responded:

[I]t was my feeling that a more conservative approach would have been much better done at that particular point in time.... [H]ad Dr. Adams or Dr. Brown then put down either a nasogastric tube or a Miller–Abbott tube and watched the patient over a period of time, I think that the surgery may well have been unnecessary or not even engaged in. In my experience in Moscow treating bowel obstructions, I would say that the general standard of

care would be to treat them conservatively. And, in a great many instances, we were able to avoid surgery on these folks.

Dr. Marineau is not a general surgeon, but is the medical director of the Medical Services Corporation in Spokane, Washington.

Several other doctors who testified on Mr. Shabinaw's behalf indicated that, in their opinions, the appropriate way to treat a small bowel obstruction is conservatively by inserting an NG tube or IV. This testimony was given by Dr. Bates who is a general surgeon practicing in Spokane, Washington, and Dr. Girvin who is also a general surgeon practicing in Spokane and is an associate of Dr. Bates. Dr. Bates and Dr. Girvin are the surgeons who operated on Mr. Shabinaw after he was transferred to Sacred Heart Medical Center in Spokane. Similar testimony was given by Dr. Pace, a retired professor emeritus of surgery who taught at Ohio State University and is now residing in Florida. All of the doctors testified that they were familiar with the standard of medical care in Moscow during the time Dr. Brown operated on Mr. Shabinaw. Dr. Girvin believed that inserting an NG tube would have allowed more time for observation to see if the obstruction would clear spontaneously and eliminate the need for surgery. However, Dr. Girvin admitted that there are differing opinions in the medical community as to when surgery should be performed when the patient suffers from a small bowel obstruction.

Although the doctors who testified on Mr. Shabinaw's behalf opined that inserting an NG tube was the appropriate treatment in this case, none expressly testified that a like physician of good standing practicing in Moscow would have disclosed to the patient that insertion of an NG tube would be an alternative treatment to surgery under the circumstances.

Several expert witnesses who testified during Dr. Brown's case-in-chief spoke on the issue of disclosure. Dr. Brown's expert witnesses all testified that they believed the first surgery was necessary and that there were no reasonable alternatives to surgery that should have been disclosed to Mr. Shabinaw. Some of the doctors testified that inserting

an NG tube may have been the right thing to do to prepare Mr. Shabinaw for surgery, but it was not necessarily an alternative to surgery under the circumstances.

Dr. David Spencer, who is a general surgeon practicing in Lewiston, gave the following testimony in direct examination:

Q: All right. In regard to your knowledge of the standard of care for Dr. Brown in 1983, are you familiar with the requirements of the standard of care concerning what—what the doctor is obligated to impart to the patient preoperatively in terms of complications?

A: Yes.

Q: Okay. Now, I want you to assume the following hypothetical: that in keeping with Dr. Brown's habits, practices, and procedures in this area, which he [testified earlier that he] followed; that he discussed with Mr. Shabinaw the possibility of infection, hemorrhage, and anesthesia risks before the 12/17/83 surgery [the first surgery] was performed. Assuming that, do you have an opinion as to whether or not that advice to Mr. Shabinaw complied with the standard of care? And do you hold this opinion with a reasonable degree of medical certainty?

A: Yes, I have an opinion.

Q: What is it?

A: My opinion is that that would be a sufficient discussion of what was to be done and what the reasonable complications were. . . .

. . . .

Q: Now, taking into account the fact that Dr. Brown did the surgery when he did it in this case; take into account the records you reviewed and the opinions you have given regarding the necessity of this surgery or the appropriateness of this surgery. Do you have an opinion as to whether or not the standard of care required Dr. Brown before the operation commenced to discuss with Mr. Shabinaw an alternate form of treatment such as long-tube or short-tube decompressing

of the nature we described in the literature?

A: Yes, I have an opinion.

Q: What is your opinion?

A: Well, my opinion is that, as has been pointed out, there's controversy about that. And since there is controversy about that and I—my opinion is firm—that it's not something that I discuss with people as an alternative because I don't think it's a reasonably healthy alternative considering that the possibility of missing an obstruction and having the patient being sick several days later and needing an operation anyway and being sicker and having a greater chance of dying is something that you need to discuss in any great degree.

In an effort to discredit this testimony by Dr. Spencer, counsel for Mr. Shabinaw read from Dr. Spencer's deposition during cross-examination:

QUESTION: Do I understand you then to be saying that if you had a patient like Gene Shabinaw in whom you suspected a total bowel obstruction that you would recommend a trial of conservative management before surgical intervention and would wait somewhere between one to two hours on the low end to say six hours on the high end of a trial of conservative care before surgery.... [ANSWER:] ... But what I said about waiting on Mr. Shabinaw would be that I wouldn't rush him to surgery in thirty minutes. I would probably take him to surgery based on what I know of his record within an hour or two. In the meantime, I would put an NG tube in hi[m] and I would give him some fluids and I would probably give him something for pain even if I ultimately operated on him. And when I say even, I'm assuming that I would ultimately operate on him. And I wouldn't want to wait longer than, you know, five or six hours. QUESTION: And during that period of time, this one to five to six hours, you would be trying these conservative measures both for the patient's comfort as well as to see if it might help relie[ve] the bowel? ANSWER: I think that's fair to say.

Dr. Donald Adams, who testified on behalf of Dr. Brown, stated that he believed Mr. Shabinaw needed immediate surgery, and he did not believe that there were any reasonable alternatives to surgery. Dr. Adams was Mr. Shabinaw's family physician and was the first doctor to examine Mr. Shabinaw when he arrived at Gritman Memorial Hospital. Dr. Adams also testified that he did not believe it was necessary to insert an NG tube into Mr. Shabinaw any time sooner than when they did—at the time anesthesia was administered immediately prior to the first surgery.

Dr. Frank Fazzio, a physician currently practicing in Boise, testified that he believed the first surgery was necessary, and that under the circumstances there were no reasonable medical alternatives to surgery which should have been disclosed to Mr. Shabinaw. He testified that he believed that Dr. Brown met the standard of care when he performed the first surgery without explaining any other alternatives to Mr. Shabinaw prior to surgery. Had he been in Dr. Brown's position he would have inserted an NG tube in preparation to surgery, but not as an alternative to surgery.

Dr. Howard Reber, a general surgeon practicing in Los Angeles who specializes in gastrointestinal disease, testified that he believed performance of the first surgery was timely and appropriate and that there was no reasonable alternative treatment to surgery. Dr. Reber believed that Dr. Brown violated the standard of care by not first inserting an NG tube, but the failure to insert an NG tube had no effect on the outcome of the case. He concluded that "not having placed the nasogastric tube ... in no way ... affected the need to operate."

Dr. Brown testified that prior to performing the first surgery he believed that there was no viable alternative to surgery. He also testified, however, that "with the power of retrospection" he now believes that inserting an NG tube would have been a viable alternative to surgery. Dr. Brown explained that inserting an NG tube instead of immediately proceeding to surgery would have involved some risks, and that he had to weigh

the risks in deciding whether to operate. He admitted that, only after operating on Mr. Shabinaw, did he realize that inserting an NG tube prior to surgery would have given Mr. Shabinaw more of a "chance to get better."

In sum, the testimony of the expert witnesses is conflicting as to whether a viable, non-surgical alternative existed in this case. As Judge Bengtson noted:

> Medical experts with impressive credentials testified both ways, i.e., some opined that intubation was a viable method of treating Mr. Shabinaw's distress, while others opined that it was not. Likewise, excerpts from learned medical treatises and journals, employed by the parties in the examination of such experts, differed on that issue.

Despite this acknowledged conflict in the experts' opinions, Judge Bengtson believed that the verdict on the informed consent issue with regard to the first surgery was not in accord with the law. He concluded that nasogastric therapy was a viable alternative to the first surgery and that Dr. Brown had failed to sustain his burden of explaining the justification for why he did not discuss the possibility of nasogastric therapy with Mr. Shabinaw.[1] This determination appears to be based primarily upon doubt as to Dr. Brown's credibility, as expressed in the following comments:

> In this Court's opinion, the testimony of Dr. Brown on the informed consent issue is entitled to little weight and brings into question his credibility. This Court not only heard his testimony but also observed his manner of testifying. His answers to questions on the consent issue were persistently equivocal, and on occasion, evasive. He had, during the extended time he was on the stand, more than adequate opportunity to tell the Court and the jurors just what it was he told Mr. Shabinaw and

what it was he did not tell Mr. Shabinaw regarding the alternative or alternatives to the first and second surgeries and regarding the anticipated complications attendant to the surgeries or other alternate procedures. Dr. Brown simply did not avail himself of those opportunities to clearly explain what he told Mr. Shabinaw.

■ Regardless of doubts as to Dr. Brown's credibility, there was other substantial expert testimony and medical treatises that support the conclusion that nasogastric therapy was not a viable alternative to the first surgery. If that be the case, Dr. Brown had no duty to disclose the option to Mr. Shabinaw, and the evidence would clearly support the jury verdict. There was substantial expert testimony that Dr. Brown met the community standard of care with regard to his disclosures. There is no finding by Judge Bengtson that this evidence was not credible. Consequently, this Court cannot conclude that the verdict as to this element of Mr. Shabinaw's claim was contrary to the weight of the evidence.

## 2. Second surgery

■ The Shabinaws claimed in their original motion for new trial that the record demonstrated that Dr. Brown had failed to obtain Mr. Shabinaw's informed consent to the second surgery on the basis that the risks and complications anticipated by Dr. Brown were not communicated to Mr. Shabinaw. They argued that Mr. Shabinaw would not have consented to the second surgery had Dr. Brown communicated the risks and complications to him.

None of Mr. Shabinaw's expert witnesses testified about what particular risks or complications a like physician in Moscow would disclose to a patient under similar circumstances. However, Dr. Brown and his expert witnesses, Dr. Spencer and Dr. Reber, testified that the standard of care required a

---

1. Citing to *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972), Judge Bengtson noted that the plaintiff bears the burden of going forward with evidence of nondisclosure, but "once such evidence has been produced, then the burden of going forward with evidence pertaining to justification for failure to disclose shifts to the physician." Although *Sherwood v. Carter*

overruled portions of *Rook v. Trout* which relied on *LePelley v. Grefenson*, 101 Idaho 422, 614 P.2d 962 (1980) and *Cobbs v. Grant*, the rule pertaining to the burden of proof in informed consent cases which is cited by Judge Bengtson appears to have remained undisturbed by the *Sherwood* opinion. The *Sherwood* opinion did not discuss the burden of proof issue.

doctor to disclose those risks and complications which he or she reasonably anticipated would occur after surgery.

Dr. Brown testified that he knew the second surgery would be difficult, but that he had reasonably anticipated that Mr. Shabinaw would experience the same complications he had experienced from the first surgery, but in a more severe degree. The complications which followed both the first and second surgeries included sepsis, fistulae, and various postoperative infections. After the second surgery, Mr. Shabinaw also experienced renal failure and adult respiratory distress syndrome. Dr. Brown testified that he did not anticipate the renal failure or the adult respiratory distress as complications to the second surgery.

Dr. Spencer testified that a competent surgeon could not have anticipated renal failure as a possible complication to the second surgery. Dr. Reber testified that a competent surgeon could not have anticipated the shock, lung and renal failure Mr. Shabinaw experienced after the second surgery. Dr. Murphy, who assisted Dr. Brown in deciding to proceed with the second surgery, testified that a reasonably competent surgeon could not have anticipated the complications that arose after the second surgery. With regard to the type of risks that should have been disclosed, Dr. Fazzio stated that the standard of care did not necessarily require a surgeon to tell a patient in contemplation of abdominal surgery that there was a high risk of death.

Whatever risks or complications should have been reasonably anticipated, Dr. Brown had a duty to disclose them to Mr. Shabinaw prior to surgery. Dr. Brown gave the following testimony in response to his attorney's question about what discussions he had with Mr. Shabinaw prior to the second surgery:

A: Well, Mr. Shabinaw is—was at that time probably the one person in the world who knew better than anybody else that, you know, you could have a fistula after an operation. And that's not something that—I mean we discussed it, but it was an obvious point that should he have another operation that we might have more trouble of some kind. And I had talked to him many times about the—you know, his anatomy, and the very friable or easily injured nature of his intestines, and he did—he did know about that. As we began to see this phenomena of the fistula reopening a few times and him not being able to eat—and we talked about this concept which I know he understood. . . .

[Court gives jury instructions that Dr. Brown's speculation about what Mr. Shabinaw understood should be stricken].

A: Mr. Shabinaw when we got—when— on that morning that I saw this on the X-ray with Dr. Romey, and I went to him and said, you know, I found what I think has been going on here, and I don't—I don't think there's any way around it, to get you eating again without—without an operation. The alternative is to continue on being able to drink small amounts of the water and be on hyperal indefinitely. And he and I together, at my recommendation, decided to go ahead with surgery.

Dr. Brown also testified that he advised Mr. Shabinaw that he might have a fistula, that they were going to have a rough time, but he admitted he did not tell Mr. Shabinaw that he might experience adult respiratory distress syndrome or severe life-threatening sepsis.

Vesna Shabinaw testified that she was with her husband for the majority of time he was in the hospital and that neither she nor Mr. Shabinaw were told anything about any complications which could arise from the second surgery. Mr. Shabinaw testified that the only thing that Dr. Brown explained to him prior to the second surgery was that he had adhesions and that he was a real "mess" inside.

Again, it is clear that Judge Bengtson had serious concerns with regard to Dr. Brown's credibility. He rejected Dr. Brown's argument that because Mr. Shabinaw had previously undergone complicated abdominal surgery, he was aware of the risks and complications that could arise

from the second abdominal surgery. Relying upon *Harwell v. Pittman*, 428 So.2d 1049 (La.Ct.App.1983), Judge Bengtson concluded that a patient's prior experience with post-surgical complications does not excuse a required disclosure. He also concluded that "[t]he jury's verdict implicitly finding either that such disclosures were made, or, if not made, that justification existed for such failure to disclose is against the clear weight of the evidence and is not in accord with law or justice. Justice would best be served by vacating the jury verdict on the issue of informed consent."

Despite Judge Bengtson's reservations over Dr. Brown's credibility concerning his disclosure of risks and complications associated with the second surgery, there are no specific findings upon which this Court can rely regarding what Dr. Brown did or did not tell Mr. Shabinaw, and there is no specific finding that Dr. Brown failed to disclose the risks and complications. There was no expert testimony on behalf of Mr. Shabinaw as to what particular risks or complications a like physician in Moscow would have disclosed. Therefore, this Court cannot conclude that the verdict of the jury as to this element of Mr. Shabinaw's claim was contrary to the weight of the evidence.

### B. Causation Element

■ Mr. Shabinaw carried the burden of proving that had he been informed of the risks and alternative treatments to surgery, he would not have consented to the surgeries. The only testimony given on the issue of causation was when Mr. Shabinaw responded to the following question posed to him by his counsel concerning the second surgery:

Q: All right. At any time prior to that—at any time prior to that surgery, did anyone, Dr. Brown or anyone else, ever explain to you that there might be other alternative treatment, other forms of treatment, that could take care of any problems you were having?

A: I remember no alternatives to—I certainly wouldn't have gone through this mess that I knew that was in there after I had it explained to me a number of times. I wouldn't have had it opened again if there was any other means of doing it.

Mr. Shabinaw's counsel tried to ask Mr. Shabinaw whether he would have submitted to the first surgery had he known there was alternative treatment, but opposing counsel objected and the court sustained the objection:

Q: (BY MR. HEPWORTH): Had you been told that there were other treatments available, such as putting a tube down your nose with an IV, would you have been willing to undergo surgery?

MR. QUANE: Objection, it's hypothetical and after the fact and speculative.

THE COURT: Mr. Hepworth, of course Mr. Shabinaw has the benefit of hindsight now. I think the objection is well taken. The objection will be sustain[ed].

■ The record is void of any evidence of causation with regard to the first surgery, and evidence of causation for the second surgery is slight. There is no factual finding by the district court upon which this Court can rely. An essential element of the basis for a new trial on the issue of informed consent is missing.

### C. Injury Element

■ Mr. Shabinaw presented evidence that he suffered from various complications after both surgeries. However, there are no specific findings upon which this Court can rely that these complications were the direct and proximate result of Dr. Brown's failure to disclose the risks or alternative treatments to the surgeries. The evidence as to this element of Mr. Shabinaw's claim is too limited to support an order for a new trial on this basis.

### IV.

### LIKELIHOOD OF A DIFFERENT RESULT

■ The district court made no specific finding that a new trial would lead to a different result. A review of the evidence indicates that this case was intensely litigated with an abundance of medical evidence.

Although this Court announced a new rule in *Sherwood* concerning the standard for informed consent, it is clear that the evidence in this case concerning informed consent conformed with the new *Sherwood* rule. The evidence was presented in terms of what a physician of good standing in Moscow, Idaho, would disclose under similar circumstances. The jury had before it evidence from which it could arrive at different verdicts. The controversy was clear and well litigated. The record does not indicate that the clear weight of the evidence is against the verdict or that a new trial would produce a different result.

## V.

### CONCLUSION

The district court's order for a new trial is reversed. Costs are awarded to the appellant. No attorney fees are allowed.

TROUT, C.J., and JOHNSON and WALTERS, JJ., concur.

SILAK, Justice, dissenting.

I respectfully dissent from Parts III, IV and V of the majority opinion. In my view, the Court should affirm the district court's order granting a new trial.

With respect to the nondisclosure element (Part III A) of proving a claim based on the doctrine of informed consent pursuant to *Sherwood v. Carter,* 119 Idaho 246, 805 P.2d 452 (1991), the majority reverses the district court's order granting a new trial as to the first surgery based upon the expert testimony presented by Dr. Brown, the defendant physician, which stated that nasogastric therapy was not a viable alternative to the first surgery. With respect to the second surgery, the Court concluded that the district court failed to make findings upon which the Court could rely with respect to what Dr. Brown did or did not tell Mr. Shabinaw, and that there was no specific finding that Dr. Brown failed to disclose the risks of the surgery.

I agree with the analysis set forth by Judge Bengtson in his memorandum opinion granting the Shabinaw's motion for a new trial, which was later re-affirmed by Judge

Stegner's decision after remand from this Court in *Shabinaw I.* Judge Bengtson relied on *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal. Rptr. 505, 502 P.2d 1 (1972), to note that although the burden of going forward with evidence of nondisclosure initially rests with the plaintiff, once such evidence has been produced, the burden shifts to the physician to go forward with evidence pertaining to the justification for failing to disclose. The majority opinion notes that even though *Sherwood v. Carter* overruled portions of *Rook v. Trout,* 113 Idaho 652, 747 P.2d 61 (1987), which relied on *Cobbs,* the rule regarding the burden of proof remains undisturbed.

Relying on *Cobbs,* Judge Bengtson made the following comments regarding the first surgery:

> As to the first surgery, Dr. Brown was asked by plaintiffs' counsel whether he agreed "that in this particular case a viable, favorable, acceptable, appropriate form of treatment for Gene Shabinaw would have been placing a nasogastric tube as an alternative to surgery." In response thereto Dr. Brown testified: "With the power of retrospection, I would agree with you, yes." This answer followed earlier testimony of Dr. Brown that he did "consider" using a nasogastric tube but did not so advise Mr. Shabinaw. There is no evidence as to why Dr. Brown did not inform Mr. Shabinaw of nasogastric tube therapy or the reasons why he rejected such therapy as an alternative to the first surgery. Dr. Brown simply failed to sustain his burden of explaining the justification for failure to make such a disclosure.

Judge Bengtson then took issue with Dr. Brown's credibility regarding Dr. Brown's comment that in retrospect, the nasogastric tube would have been a viable alternative to surgery:

> Dr. Brown's testimony that "with the power of retrospection" he would agree that the insertion of a nasogastric tube was a viable alternative to surgery, undercuts and belies any argument that it was not initially a viable alternative which should have been disclosed to Mr. Shabinaw. The mere fact that a bad and unfortunate result flowed from the first surgery does not

"in retrospect" suddenly make the nasogastric therapy a viable alternative to surgery. It either was or was not *initially* a viable alternative regardless of the bad result obtained on the first surgery.

Based upon Dr. Brown's admission that nasogastric therapy was a viable alternative to the first surgery, and that it was undisputed that Dr. Brown did not disclose this option to Mr. Shabinaw, Judge Bengtson concluded that such therapy was a viable alternative to surgery, and that the jury verdict on this issue as to the first surgery was against the clear weight of the evidence. I agree with this conclusion. Further, although Judge Bengtson mentions the witness's credibility, I do not believe it is necessary to defer to Judge Bengtson's credibility determinations to reach the same conclusions. The testimony by Dr. Brown regarding his nondisclosure of the alternative is clear from the record, without reference to credibility aspects of his testimony, such as demeanor. Dr. Brown admits in his brief that credibility is not an issue.

Judge Bengtson further ruled that an even stronger case existed in granting a new trial with respect to the second surgery, and that the jury's verdict was again against the clear weight of the evidence. Judge Bengtson again based this ruling on Dr. Brown's failure to justify why he did not disclose the risks that could follow:

> Although Dr. Brown unequivocally testified that he anticipated all the severe complications (except the pulmonary and renal failure and life-threatening sepsis) which manifested after the second surgery, he has failed to meet his *Cobbs* burden of explaining his justification for failing to *clearly* disclose such *anticipated* complications to his patient, Mr. Shabinaw. He posited as such justification the fact that Mr. Shabinaw had previously undergone complicated abdominal surgery. Such fact is not a defense to the plaintiffs' claim of failure to disclose.

Regardless of the testimony provided by Dr. Brown's expert witnesses, the focus should have been (and was by Judge Bengtson) on exactly what Dr. Brown told Mr. Shabinaw. According to Judge Bengtson,

Dr. Brown had every opportunity to testify as to what information he gave to Mr. Shabinaw, but did not do so:

> [Dr. Brown's] answers to questions on the consent issue were persistently equivocal, and on occasion, evasive. He had, during the extended time he was on the stand, more than adequate opportunity to tell the Court and the jurors just what it was he told Mr. Shabinaw and what it was he did not tell Mr. Shabinaw regarding the alternative or alternatives to the first and second surgeries and regarding the anticipated complications attendant to the surgeries or other alternative procedures. Dr. Brown simply did not avail himself of those opportunities to clearly explain what he told Mr. Shabinaw.

> Dr. Brown was clearly under a duty to explain to Mr. Shabinaw, in lay terms, the viable alternatives to both the first and second surgeries as well as to explain to him, likewise in lay terms, the complications that might possibly occur from any specific course of treatment, including surgical treatment, so that Mr. Shabinaw could make an intelligent choice. If defendant did not do so, he had the burden of proving justification for such failure to disclose.

Thus, contrary to the Court's opinion, Judge Bengtson clearly found that Dr. Brown had not met his burden of proving why he was justified in not making a full disclosure to Mr. Shabinaw about any alternatives to the surgeries and any risks involved. This Court can and should assess Dr. Brown's testimony as deficient with regard to what he did or did not disclose regarding surgical alternatives and risks simply from a reading of the transcript. It is not necessary for the Court to consider Judge Bengtson's credibility determinations regarding Dr. Brown's testimony.

I also agree with Judge Stegner's analysis in his memorandum decision on remand. Even after reviewing the case in light of the *Sherwood* decision, as mandated by this Court in *Shabinaw I*, Judge Stegner did not see any reason to depart from Judge Bengtson's ruling:

> After reviewing Judge Bengtson's opinion and the *Sherwood* case, the court finds

the standard set out by *Sherwood* did not severely undermine or impair Judge Bengtson's prior ruling. There is nothing this court can glean from Judge Bengtson's earlier decision which suggests that the result would be different given the objective medical community standard set forth in *Sherwood*. Therefore, this court, on remand from the Idaho Supreme Court, declines to modify Judge Bengtson's earlier decision granting the Shabinaws a new trial.

Judge Stegner's decision that the Shabinaws should be granted a new trial in the interests of justice and to afford them fundamental fairness should be followed here. The Shabinaws' case was originally tried under the law set forth in *Rook v. Trout*, 113 Idaho 652, 747 P.2d 61 (1987). Judge Bengtson thereafter granted the Shabinaws' motion for a new trial based upon the law as it existed at that time. *Rook v. Trout* was later partially overruled in *Sherwood v. Carter*. Thus, in *Shabinaw I*, this Court remanded that case to the district court to be reviewed under the new standard set forth in *Sherwood*. *Shabinaw v. Brown*, 125 Idaho 705, 708, 874 P.2d 516, 519 (1994). The Shabinaws should be given the opportunity to present their case to the jury under the standard set forth in *Sherwood*, which requires that there be objective evidence of the standard of disclosure in the community. Without awareness of this prospective standard, the Shabinaws' counsel did not frame questions to. experts regarding what physicians in Moscow would have disclosed about the surgery.

I further disagree with the majority opinion with respect to the causation element of informed consent. The Court states that the record is void of any evidence of causation and that the district court did not make any factual findings in this regard on which the Court can rely. The Court thus concludes that "[a]n essential element of the basis for a new trial on the issue of informed consent is missing." I do not believe, based upon the procedural history of this case, that the Court is free to reach such a conclusion.

The jury returned a special verdict finding that Dr. Brown neither failed to meet the applicable standard of care in performing the surgeries nor failed to obtain Mr. Shabinaw's informed consent. The jury never made a determination as to causation or damages, either on the negligence claim or the informed consent claim. In *Shabinaw I*, this Court rejected the same lack of causation argument that Dr. Brown makes here, namely, that the jury's special verdict finding of no negligence by Dr. Brown in performing the surgeries necessarily "precludes the Shabinaws from proving that any breach of the standard of care as to informed consent proximately caused injury to Mr. Shabinaw." (Appellant's Brief, pg. 29). With respect. to this argument, the Court ruled as follows:

> Dr. Brown also asserts that the jury's verdict on the issue of negligence eliminated the possibility that Mr. Shabinaw's injuries were proximately caused by the operations. The jury's determination that Dr. Brown did not operate negligently does not establish that the operations were not the proximate cause of some or all of the Shabinaws' damages, or that Mr. Shabinaw would not have consented to the operations if he were properly informed. A physician can be liable for failure to obtain informed consent before treatment without being negligent in the actual treatment of the patient.

*Shabinaw I*, 125 Idaho at 709, 874 P.2d at 520. Thus, the *Shabinaw I* Court rejected the very same causation argument advanced here. I believe the law of the case doctrine, *see Suitts v. First Sec. Bank of Idaho*, 110 Idaho 15, 21, 713 P.2d 1374, 1380 (1985); *Sun Valley Ranches, Inc. v. Prairie Power Coop.*, 124 Idaho 125, 129, 856 P.2d 1292, 1296 (Ct. App.1993), precludes a reexamination of any causation issue on this second appeal.

Moreover, the structure of the *Shabinaw I* opinion reveals that there was no mandate to the district court on remand to reexamine the causation issue, and Judge Stegner did not do so in his memorandum decision. In *Shabinaw I*, the Court addressed the change in the law created by *Sherwood v. Carter*, as follows:

> In *Sherwood*, this Court "overrule[d] those portions of *Rook v. Trout* which held that I.C. § 39–4304 merely provides alternative

defenses to a claim of lack of informed consent, and which held that the statute provides for a subjective patient-based standard of disclosure for informed consent." *Id.* at 256, 805 P.2d at 462 (overruling *Rook v. Trout,* 113 Idaho 652, 747 P.2d 61 (1987).) Because at the time it issued its memorandum decision and order the trial court was bound by case law that has since been overruled, we remand this action to allow the trial court to reconsider its decision in light of the new law. [Citations omitted].

*Shabinaw I,* 125 Idaho at 708, 874 P.2d at 519. The opinion then goes on to rule on the causation issue as noted above, but does not include any direction to the district court to reexamine the causation issue in light of *Sherwood,* in contrast to the issue of the subjective versus objective standard of informed consent.

In summary, because in my view *Shabinaw I* has already ruled upon the same informed consent issue advanced by Dr. Brown on this appeal, and because the Court in *Shabinaw I* did not mandate the district court to reconsider the causation issue, I respectfully dissent from the causation and related damages holding in the Court's opinion at Parts III B and C.